**EXHIBIT G**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAVID J. BRADFORD AND GERARDO L. LINARDUCCI,<br><br>Defendants. | Civil Action No. 1:25-cv-_____<br><br>JURY TRIAL DEMANDED |

### COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

### OVERVIEW

1.      From 2020 through 2024, Russell Todd Burkhalter and his company Drive Planning, LLC ran a massive Ponzi scheme. Drive Planning sold investors unregistered securities through its "Real Estate Acceleration Loans" program ("REAL"), for which the company falsely promised investors 10% returns every three months. In reality, Burkhalter used investor funds to pay fictitious returns to investors and to support his lavish lifestyle. As of August 2024—when the SEC

obtained emergency relief from the Court to stop the fraud—over 2,000 investors had invested more than $300 million in the scheme.

2. Burkhalter did not act alone. Defendants David J. Bradford and Gerardo L. Linarducci each played a crucial role in perpetrating the REAL Ponzi scheme.

3. Bradford was Drive Planning's Chief Operating Officer ("COO") and Linarducci was the Managing Partner and head of Drive Planning's Indiana branch office. Together, they formed Drive Planning's senior management team along with Burkhalter.

4. In furtherance of the REAL scheme, among other things, Bradford and Linarducci solicited investors in REAL; managed teams of sales agents who sold the investment; appeared in videos and social media posts promoting Drive Planning's business; and conducted training sessions for agents to boost investments in REAL.

5. In connection with their sales of REAL, Bradford and Linarducci told investors, among other things, that the promised 10% rate of return was guaranteed; investors held an interest in underlying collateral as part of their investment; Drive Planning partnered with real estate developers in profit-sharing agreements; and profits from those partnerships funded the promised return to REAL investors.

6. These representations were false, and Bradford and Linarducci either knew they were false or were, at least, severely reckless in making the statements.

2

7.     In truth, Drive Planning did not generate significant profits from real estate deals.  Instead, the company used most of the investor funds to pay fictitious returns to other investors, support Burkhalter's extravagant lifestyle, and pay millions of dollars in compensation to Bradford, Linarducci, and sales agents they oversaw.

8.     Bradford and Linarducci played integral roles in fueling the REAL fraud.  According to Drive Planning's records, Bradford sold more than $35 million in REAL investments and his sales team sold more than $100 million.  Drive Planning's records reflect that Linarducci sold more than $13 million in REAL investments and his sales team sold more than $30 million.

9.     Bradford and Linarducci received millions of dollars in compensation for selling REAL investments.  Between 2020 and 2024, Drive Planning paid Bradford approximately $26 million in total compensation.  Between 2022 and 2024, Drive Planning paid Linarducci approximately $7.5 million in total compensation.

10.    By engaging in the conduct described in this Complaint, Defendants violated Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2), and 77q(a)(3)]; Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a)]; and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

11.    Defendant Linarducci also aided and abetted Burkhalter's and Drive

3

Planning's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## JURISDICTION AND VENUE

12.    The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement plus prejudgment interest, for civil penalties, and for other equitable relief, including conduct-based injunctions described more fully below.

13.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

14.    Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

15.    Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  Defendant Bradford resides in this district, Drive

Planning's principal place of business was in this judicial district, and certain REAL

investors reside in this judicial district. In addition, Defendant Linarducci, in his

management role at Drive Planning, traveled to this judicial district to conduct

business, attend company meetings, and help lead sales agent training.

16.     Defendants, unless restrained and enjoined by this Court, will continue

to engage in the transactions, acts, practices, and courses of business alleged in this

complaint, and/or in transactions, acts, practices, and courses of business of similar

purport and object.

### THE DEFENDANTS

17.     **David J. Bradford**, age 53, is a resident of Peachtree Corners,

Georgia. Bradford is the former COO of Drive Planning. He began working there

in 2019 and resigned in June 2024. While working at Drive Planning, Bradford

maintained his own personal financial consulting entity. Before working at Drive

Planning, Bradford worked as a church pastor and a retail salesman.

18.     During the SEC's pre-suit investigation, Bradford asserted his Fifth

Amendment privilege against self-incrimination on all questions related to Drive

Planning and the REAL investment.

19.     **Gerardo L. Linarducci**, age 61, is a resident of Indianapolis, Indiana.

Linarducci is the former Managing Partner of Drive Planning and was head of the

company's Indiana branch office. He began working at Drive Planning in July

2022 and resigned from the company in August 2024.

20.    Before joining Drive Planning, Linarducci had extensive experience in the financial industry.  From approximately 1996 to 2021, Linarducci worked as a registered representative for several SEC-registered broker-dealers.  He has held Series 6 and 63 FINRA licenses.

21.    Linarducci currently operates several entities that provide financial planning and professional coaching services, including Integrity Wealth Partners, LLC; EYE Can Coaching, LLC; and Ducci Enterprise, LLC (all Indiana entities operated by Linarducci).

22.    During the SEC's pre-suit investigation, Linarducci asserted his Fifth Amendment privilege against self-incrimination on all questions related to Drive Planning and the REAL investment.

23.    Shortly after Drive Planning ceased operations, Linarducci sought to involve some of his former colleagues in a new venture that would include financial advice and private placements.

## RELEVANT THIRD PARTIES

24.    **Russell Todd Burkhalter**, age 54, is a resident of St. Petersburg, Florida.  Burkhalter was the sole owner of Drive Planning which he operated from offices in Alpharetta, Georgia.

25.    The SEC filed suit against Burkhalter and Drive Planning on August

13, 2024.  *See SEC v. Drive Planning, LLC, et al.*, Civil No. 1:24-cv-03583-VMC

(N.D. Ga.).  The complaint in that action describes the origin, growth, and

operation of the Ponzi scheme.  On April 10, 2025, the Court entered judgment as

to liability against Burkhalter enjoining him from, among other things, violations

of the antifraud provisions of the federal securities laws, and reserving issues of

financial remedies for later determination.

26.    **Drive Planning, LLC** is a Georgia limited liability company.

Burkhalter formed Drive Planning in 2015, listing himself as organizer and

registered agent, and listing offices in Johns Creek (Fulton County), Georgia.

Since August 13, 2024, Drive Planning has been under the control of a court-

appointed receiver.

## FACTS

### The REAL Ponzi Scheme

27.    In September 2020, Drive Planning began offering to the public what

it described in promotional materials as a "bridge loan opportunity promising 10%

in 3 months."  Drive Planning named the investment vehicle "REAL" (an acronym

for "Real Estate Acceleration Loan").

28.    Burkhalter and the sales agents he recruited told prospective investors

that Drive Planning would pool their money and loan it out to property developers,

and/or enter into joint ventures with property developers, and thereby generate the

7

profit necessary to meet obligations to REAL investors.

29.     Drive Planning offered the REAL investment for sale nationwide and accepted investments from international investors.

30.     Investors received promissory notes as evidence of their investment, some of which specifically refer to the funds as an "investment."

31.     Investors generally wired funds into Drive Planning's bank accounts when they invested in REAL.

32.     Drive Planning investors did not have any control over how Drive Planning used their funds.

33.     The REAL investment was a Ponzi scheme from day one.  In fact, Drive Planning used funds from the first REAL investor to pay an individual who had previously invested in an energy investment offered by Drive Planning.

34.     Drive Planning's REAL investment grew substantially between September 2020 and May 2024.  Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, the company raised more than $336 million from more than 2,000 investors in at least 48 states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

35.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments.  Drive Planning did not use accounting

software or keep typical financial or accounting records.

36.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to REAL investors and owed investors $287 million as of May 6, 2024.  The available bank records approximately match these values, showing Drive Planning raised $372 million from investors and repaid them $154.9 million from September 2020 through June 2024.

37.     Drive Planning had no viable means of generating the profits necessary to pay REAL investors a 10% return.

38.     In fact, from September 2020 through June 2024, Drive Planning's main accounts received deposits of $389.6 million.  Of these deposits, at least $372 million (95.4%) were received from REAL investors.  During this same period, Drive Planning only received funds totaling $17.6 million from other sources.

39.     Based on the bank records, from September 1, 2020 to June 2024, investors received "returns" of $154.9 million.  With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

| Summary | | | | | | |
|---|---|---|---|---|---|---|
| **Deposits** | | | | **Ponzi Analysis** | | |
| Total Deposits | | $ 389,665,393 | | Non-Investor Deposits | $ | 17,642,625 |
| Less: Investor Deposits | | (372,022,769) | | Less: Investor Repayments | | (154,918,462) |
| Non-Investor Deposits | | $ 17,642,625 | | (Investor-Funded Repayments) | $ | (137,275,837) |

40.     Without new investor funds, Drive Planning would not have been able to meet its repayment obligations.

41.     In addition, Burkhalter spent REAL investor funds to support a lavish lifestyle.  Among other things, Drive Planning and Burkhalter spent $2 million on a yacht, $4.6 million on chartering private jets and luxury car services, and more than $300,000 on clothing, jewelry, and beauty treatments.

**The Defendants' Critical Role in the REAL Ponzi Scheme**

42.     Bradford and Linarducci each played an important role in perpetrating the REAL Ponzi scheme.

43.     Bradford was Drive Planning's Chief Operating Officer.

44.     Linarducci was Drive Planning's Managing Partner and head of Drive Planning's Indiana branch office.

45.     Together, they formed the senior management team of Drive Planning along with Burkhalter and were the public face of the company in promotional videos and social media posts.

46.     Bradford and Linarducci regularly communicated with Burkhalter and others at Drive Planning regarding the management of the company and REAL using text messaging and email, and during bi-weekly leadership meetings.

47.     Bradford and Linarducci each personally solicited investors in REAL. In soliciting prospective investors in REAL, Bradford and Linarducci sometimes

used versions of Drive Planning's promotional materials that were branded with their respective names or the names of their personal business entities, and included photographs of themselves.

48.     Bradford began soliciting investors in REAL in September 2020 and continued doing so until June 2024.

49.     Linarducci began soliciting investors in REAL in July 2022, when he joined Drive Planning, and continued doing so until June 2024.

50.     Bradford and Linarducci communicated with REAL investors and prospective investors on the phone, through email, and via text message.  They also appeared in videos promoting Drive Planning and/or the REAL investment that were posted on the company's website.

51.     In addition, Bradford and Linarducci personally solicited and managed sales representatives who solicited tens of millions of dollars in REAL investments.  Defendants made the same misrepresentations to their sales agents as they made to investors.

52.     Drive Planning's records show that Bradford raised more than $35 million from investors for the REAL program.

53.     Drive Planning's records show that Bradford's sales team raised more than $100 million from investors in the REAL program.

54.     Drive Planning's records reflect that Linarducci raised more than

$13 million from investors for the REAL program.

55.     Drive Planning's records show that Linarducci's sales team raised more than $30 million from investors in the REAL program.

### Defendants Make Millions from the Fraud

56.     Drive Planning paid Bradford and Linarducci commissions for their work on REAL and, specifically, for getting investors to invest in the program.

57.     Specifically, although most sales agents received a 4% commission on each sale, Drive Planning generally paid Bradford 6% commissions and Linarducci 5.5% commissions on funds they raised for REAL.  Drive Planning also generally paid Bradford and Linarducci an additional 1.5% commission on funds their respective sales agents raised for REAL.

58.     Drive Planning processed most of its payments to Bradford, Linarducci, and other sales agents using a payroll processing service.

59.     Records from the payroll processing service and bank records show that between 2020 and 2024, Drive Planning paid Bradford approximately $22 million for his work on REAL.

60.     In addition, Drive Planning also loaned Bradford approximately $2 million for the purchase a home in St. Petersburg, Florida and split the purchase of a $4 million condominium in Mexico with him.

61.     In total, Bradford received approximately $26 million from Drive

Planning based on his work for the REAL program.

62.     Records from the payroll processing service and other records show that between 2022 and 2024, Drive Planning paid Linarducci approximately $6 million in compensation for his work on REAL.

63.     Drive Planning also bought Linarducci a house for approximately $2 million in Fishers, Indiana.

64.     In total, Linarducci received approximately $7.5 million from Drive Planning for his work on the REAL program.

**Defendants Made False and Misleading Statements to Investors**

65.     Bradford and Linarducci reaped those millions of dollars by making misrepresentations to REAL investors and omitting material facts in connection with the offer and sale of the REAL investment.

66.     Bradford and Linarducci misrepresented, among other things:

- That Drive Planning would use investor funds for real estate deals;

- That the REAL investment had a "guaranteed return" of 10% every month;

- The source of supposed returns paid to investors;

- The existence of profitable real estate development partnerships which supposedly generated the returns paid to investors; and

- The existence of collateral securing the REAL investment.

67.     Based on information provided by Bradford and Linarducci, the sales agents on their respective teams made similar misrepresentations to investors.

68.     For example, Drive Planning promotional materials that Bradford and Linarducci sent to investors falsely stated that investor funds would be secured and fully protected by collateral—"millions of dollars in cash and real estate that [Drive Planning] own[s] outright."

69.     Bradford and Linarducci also distributed a one-page marketing document (the "Collateral Sheet)" that listed real estate Drive Planning falsely claimed to own and use as collateral underlying REAL investments.  In reality, investor funds were not protected by the property listed as collateral on the Collateral Sheet.  In fact, many of the properties were titled in the names of Burkhalter, his wife, their affiliated entities, Bradford, and Linarducci.

70.     Bradford and Linarducci represented to investors that Drive Planning had partnerships with real estate developers, but for most of REAL's duration, Drive Planning's only such relationships were with a single Georgia-based real estate development company and an entity affiliated with Burkhalter's then brother-in-law.  Neither of these relationships involved an agreement on the part of the developer to split profits, and the Georgia-based real estate development company terminated its informal agreement with Drive Planning no later than June 2023.

71.     In connection with the offer and sale of REAL investments, Bradford, Linarducci, and their sales agents also omitted to disclose:

- That supposed profits paid to investors were actually Ponzi payments from other investors;

- That there was no profit-generating engine producing the promised returns; and

- That REAL investments were not collateralized.

72.     The representation of 10% returns every three months required Drive Planning to earn at least 40% profit per annum from their supposed real estate investments to pay the promised returns to REAL investors.

73.     In actuality, Drive Planning's supposed lucrative real estate development deals would have needed to earn an even greater profit every year to account for the payment of 4% commissions on each sale and the need for Drive Planning's supposed real estate development partners to have a share of the supposed profits.

74.     Contrary to the representations made by Bradford and Linarducci, Drive Planning did not have real estate deals that yielded such returns to pay the promised returns to investors.

75.     In short, Drive Planning gave investors the illusion of such an enterprise by using money from later investors to pay supposed profits to earlier investors in classic Ponzi fashion.

**Defendants Questioned the Legitimacy of REAL But Continued Selling It**

76.     Communications between Bradford, Linarducci and others demonstrate that Bradford and Linarducci had concerns about the legitimacy of REAL at least as early as spring 2023.

77.     On June 6, 2023, Bradford texted Linarducci that he was concerned about Drive Planning and the REAL program.  Bradford indicated that they "need to get clarity & ability to confirm financials.  This is a very serious moment."

78.     Linarducci responded two minutes later, writing: "Agreed 100%.  I actually had a breakfast meeting with my coach this morning regarding all this and my concern and [his] concern as well as the s#$% could be hitting the fan as we speak.  We really need to get this all taken care of."

79.     On June 13, 2023, a sales agent texted Linarducci that the agent was concerned about how others might characterize REAL as being similar to Ponzi schemes that were subject to recent SEC enforcement actions.  Linarducci responded that the sales agent should "shut them up and close the deal."

80.     On June 17, 2023, Linarducci texted Bradford a draft message to be sent to Burkhalter regarding another sales agent's concerns about REAL and the need for additional information to verify that it was a legitimate investment.  In the message, Linarducci wrote that "We must address all of [the sales agent's] concerns, **which I do believe are valid**." [emphasis added].

16

81.     Both Bradford and Linarducci continued selling REAL investments, always neglecting to share their valid concerns about the legitimacy of the program with prospective investors.

82.     On June 27, 2023, Bradford forwarded an email to Linarducci from a sales agent who decided to stop soliciting investors in REAL because she was concerned that the investment was not legitimate.

83.     In the email, the sales agent wrote: "I started asking questions 2 months ago. I find it unsettling to not receive the answers."

84.     The sales agent further wrote: "You [Bradford] mentioned 'The profits are huge!' Well that's great news but the only profits I have seen are 2 small houses listed in the March collateral sheet. . . . They need to be not only huge, but monthly in order to keep up with the accrual of interest."

85.     On June 28, 2023, Linarducci emailed Bradford to stop using the words "investment" and "guarantee" in describing REAL. Linarducci wrote that the "verbiage" Bradford was using "is a compliance nightmare."

86.     Linarducci went on to write Bradford: "It is only a matter of time before YOU open an[] SEC/FINRA case. That will be the end of Drive Planning."

87.     Later in the same email, Linarducci wrote: "[N]ow that all this is out online, it can get and will get to the SEC and our little gig, is over."

88.     Despite receiving numerous questions about the legitimacy of the Drive Planning investment program, Bradford and Linarducci made only limited inquiry with Burkhalter.  Specifically, in August 2023, Bradford and Linarducci emailed Burkhalter requesting more information, including proof of "REAL funds brought in and spent or deployed—shown with actual bank statements."

89.     It does not appear that they ever received this information.  When asked whether Drive Planning earned sufficient funds to cover its interest payments to investors each quarter, Linarducci and Bradford asserted their Fifth Amendment right against self-incrimination.

90.     Both Bradford and Linarducci continued selling REAL investments for another year without sharing their valid concerns with investors to whom they sold REAL investments.

91.     On February 14, 2024, Linarducci received a forwarded text message from a sales agent, who in turn had received the following message from his friend regarding REAL:  "Brother, as a friend, use your head.  NO investment pays 40% annually plus 16% commissions.  This is a scam and you're being led into with the lure of big commissions.  It's a matter of time before the SEC charge[s] the people involved.  I've been doing this long enough to see a ponzi when it appears."

92.     Linarducci continued selling REAL investments anyway.

93.     On March 14, 2024, a sales agent texted Bradford that another Drive

Planning sales agent had cautioned people to stop investing in REAL and that the SEC was investigating Drive Planning and contacting people about the investment. Bradford responded that "It's bull@#$%."

94.     On May 21, 2024, Linarducci texted a colleague:  "Counsel just called me.  He told me to stop drive offerings."

95.     The colleague responded, "Oh my gosh!  Why?"  Linarducci told the colleague that he would call in 30 minutes and then wrote:  "I'm not gonna lie.  I do not have a good feeling about this at all."

96.     Nevertheless, Linarducci continued to solicit investments in REAL. He did so even though he was a formerly registered representative of a broker-dealer who held a Series 63 and Series 6 license and had considerable experience in the financial industry.

97.     As late as June 10, 2024, Drive Planning received a $40,000 investment in REAL after Linarducci solicited the funds from an investor.

98.     On June 13, 2024, the investor emailed Linarducci seeking his funds back.  Linarducci responded that "We have everything under control."

99.     Bradford also continued to solicit investors in REAL as late as May 24, 2024, despite knowing about the SEC's investigation and without disclosing it to investors.

100.   Even before Bradford and Linarducci's private expressions of "valid"

concerns regarding REAL's legitimacy, they were aware of red flags suggesting a fraud from their first day at Drive Planning.

101.   First, Drive Planning was a small and relatively new company that was founded and almost entirely operated by Russell Todd Burkhalter.  The company did not maintain financial statements or even use traditional accounting software in operating its business.  Instead, a contractor for Drive Planning tracked the hundreds of millions of dollars of REAL investments using a Microsoft Excel spreadsheet.

102.   Second, the terms of the REAL program, including the lucrative returns that were promised, should have, at a minimum, raised suspicion that the investment might not be legitimate.

103.   Drive Planning offered a 4% commission to sales agents (other than Bradford and Linarducci, both of whom received more).  The 4% commission was to be paid from the proceeds of the supposed underlying real estate development deal and was in addition to the 10% quarterly return Drive Planning promised to the investor.  Sales agents would receive the 4% commission not only for new investments, but also for any investors that renewed or "rolled over" their existing investment.  This effectively meant that for a given $1,000,000 that remained invested in REAL for a full year, Drive Planning could be required to pay $464,100 in "interest" to the investor and $160,000 in commissions to the sales

20

agent – a total of $624,100 in that one-year period.

104.    The compounding effect of the promised returns in the REAL
program meant that Drive Planning was obligated to pay investors an annualized
rate of return of 46.4%.

105.    Drive Planning did not have any revenue stream that could have come
close to covering the obligations from the REAL program.

106.    At least one real estate developer sued Drive Planning to enjoin it
from using the real estate developer's name in connection with solicitations to
prospective REAL investors.

107.    As noted above, Drive Planning did not make sufficient funds from
any of its business ventures—including the REAL program—to pay the promised
returns to investors in the REAL program.  Instead, Drive Planning used investor
funds to cover the substantial shortfall.

**Examples of Bradford's Sales**

    Investor A

108.    In May 2024, Bradford texted an investor from South Carolina
("Investor A") information about the REAL investment.  The brochure and other
information that Bradford sent to Investor A were also available on Drive
Planning's website.

109.    The information Bradford provided to Investor A falsely claimed that

21

Drive Planning would use investor funds in the REAL program to fund bridge loans to real estate developers.  The materials further explained that Drive Planning would pay investors a 10% return on their investment every three months and that investors could "roll over" their investment plus the "interest" earned each quarter.

110.   The promotional material also falsely indicated that investments in REAL were protected by collateral in real property.

111.   Based on these false representations, on May 30, 2024, Investor A invested $50,000 in Drive Planning's REAL program by wiring money to a bank account number provided by Bradford.

112.   Bradford told Investor A that he would receive a promissory note contract within a few days, but he never did.  In addition, Investor A never received a payment for his investment in the REAL program.

113.   Bradford did not disclose that Investor A's investment would or could be used to make principal or interest payments to other investors.

114.   Bradford also did not tell Investor A that his money would or could be used to fund personal purchases by Drive Planning's principals.

115.   Bradford did not disclose to Investor A that he had concerns about the legitimacy of REAL at least as early as June of 2023.

Investor B

116.   In 2021, Bradford spoke by phone to another investor in South

22

Carolina ("Investor B"), soliciting him to invest in REAL. During that call, Bradford falsely represented that REAL would produce a guaranteed return of 10% for a three-month investment and that the investor's funds would be used to make bridge loans to property developers or to enter profitable joint ventures with property developers.

117.   Bradford spoke to Investor B again in 2022 along with Burkhalter.

118.   In their conversation with Investor B, Bradford and Burkhalter referred him to a list of properties that they falsely claimed were owned by Drive Planning either solely or as part of a joint venture with a real estate developer partner and would be collateral for his investment.

119.   Bradford did not disclose that Investor B's investment would or could be used to make principal or interest payments to other investors.

120.   Bradford also did not tell Investor B that his money would or could be used to fund personal purchases by Drive Planning's principals.

121.   In reliance on the above false representations and in ignorance of the above omissions, Investor B invested $45,000 in REAL in 2022. Encouraged by what he thought were profits on that first investment, he invested another $100,000 in REAL in 2024.

Investor C

122.   In 2021, an investor from Georgia ("Investor C") became aware of

Drive Planning's REAL program through a pre-existing relationship with Burkhalter. Burkhalter told Investor C that REAL was a profit-sharing deal in which Drive Planning provided capital to real estate developers and then Drive Planning would split the profits from the sale of the developed land. Drive Planning would also distribute a portion of the returns to investors.

123.   Burkhalter told Investor C that investors would be paid a guaranteed 10% return on their investment in REAL. Based on these assurances, Investor C invested more than $100,000 in REAL.

124.   After Investor C's wife was diagnosed with a serious illness, they received approximately $300,000 from an insurance policy. Bradford, who by this time had become acquainted with Investor C, encouraged Investor C and his wife to invest some of the insurance proceeds in REAL.

125.   Based on Bradford's recommendation that the REAL investment would be a good use of the insurance proceeds, Investor C and his wife invested an additional $280,000 in REAL in June 2023.

126.   Bradford did not disclose that Investor C's investment would or could be used to make principal or interest payments to other investors.

127.   Bradford also did not tell Investor C that his money would or could be used to fund personal purchases by Drive Planning's principals.

128.   Bradford did not tell Investor C that certain of the properties paid for

by Drive Planning using investor funds were not owned by Drive Planning.

129.    In August 2023, Investor C received an email from Drive Planning with a link to a video labeled "REAL Opportunity Financial Update."  In the video, Bradford and Burkhalter discussed the status of the REAL program.

130.    Based on the representations made in the video by Bradford and Burkhalter, Investor C believed that Drive Planning was using investor funds in REAL to fund real-estate development projects on which Drive Planning would earn a return that would ultimately benefit Investor C as an investor.

131.    Bradford did not disclose to Investor C that he had concerns about the legitimacy of REAL at least as early as June of 2023.

**Examples of Linarducci's Sales**

Investor D

132.    In or around April 2024, Linarducci spoke to an investor from Massachusetts ("Investor D") about Drive Planning's REAL program.  Investor D had already spoken to Bradford about the investment.  Bradford falsely told investor D that Drive Planning would use investor funds to make short term loans to real estate developers and builders.  Drive Planning would pay investors a guaranteed return of 10% every three months if they invested in REAL.  Investor D also reviewed information about REAL on Drive Planning's website.

133.    Investor D wanted further assurances about the REAL program, and

he spoke to Linarducci about the investment. Investor D understood Linarducci to be a Managing Director at Drive Planning. Linarducci repeated the false representations that Bradford had told Investor D about the REAL program.

134. In May 2024, Investor D invested all of the funds from a retirement account that he had in the REAL program.

135. Linarducci and others at Drive Planning did not disclose that Investor D's investment would or could be used to make principal or interest payments to other investors.

136. Linarducci and others at Drive Planning also did not tell Investor D that his money would or could be used to fund personal purchases by Drive Planning's principals.

137. Linarducci did not disclose to Investor D that he had concerns about the legitimacy of REAL at least as early as June of 2023.

Investor E

138. In May 2023, Linarducci spoke to an investor from Nebraska ("Investor E") over the phone about the REAL investment. Investor E understood Linarducci to be a manager at Drive Planning.

139. Linarducci falsely told Investor E that the REAL program was an investment opportunity involving a promissory note that funded real estate development projects. Linarducci falsely indicated that Investor E would earn a

10% return every three months and that the investment would be protected by collateral in the form of property owned by Drive Planning. Investor E understood that these returns would be paid based on the profits Drive Planning earned from the loans to real estate development firms.

140.  Linarducci also sent Investor E promotional materials via email for the REAL investment. These materials included the name "Ducci University"– which is affiliated with Linarducci—and one of the brochures included a photo of Linarducci.

141.  The promotional materials falsely reiterated that investors in REAL would earn 10% returns every three months.

142.  The promotional materials also stated the following: "The Real Estate Loan is Fully Collateralized (Protected) by Cash and Real Estate"; The real estate developers "agree to share their profits with us and our lenders (which is you)"; and "[T]he risk is really low."

143.  Linarducci told Investor E that REAL was a good fit for them.

144.  On July 6, 2023, Investor E invested $60,000 in the REAL program by mailing a check from a bank account to Drive Planning.

145.  Linarducci did not inform Investor E that Drive Planning would pay Linarducci a commission based on the investment in REAL.

146.  Linarducci did not disclose that Investor E's investment would or

could be used to make principal or interest payments to other investors.

147. Linarducci also did not tell Investor E that his money would or could be used to fund personal purchases by Drive Planning's principals.

148. Linarducci also failed to tell Investor E that Drive Planning did not own some of the properties that it touted as collateral for the REAL investment.

149. Linarducci did not disclose to Investor E that he had concerns about the legitimacy of REAL at least as early as June of 2023.

Investor F

150. In the summer of 2023, Linarducci began messaging an investor from Indiana ("Investor F") about Drive Planning's REAL program. Investor F understood that Linarducci was a manager of the company.

151. Over dinner, Linarducci told Investor F and her husband that they were good candidates for the REAL investment. Linarducci falsely told Investor F and her husband that the REAL program was an investment in real estate development opportunities that paid investors a return of 10% every quarter.

152. Linarducci also falsely told them that investments in REAL were protected by collateral in the form of property owned by Drive Planning.

153. Investor F asked Linarducci how Drive Planning could generate such high returns in its REAL program. Linarducci responded by falsely touting the profitability of Drive Planning's development deals and said that Drive Planning

used the Real Estate Development Company for developments.

154.   Linarducci also sent Investor F promotional materials for REAL, which outlined the same false terms he had verbally represented to them.

155.   On or about August 18, 2023, Investor F and her husband made an initial investment in REAL by wiring $35,000 from their bank account to Drive Planning.  They subsequently made additional investment in REAL totaling more than $200,000.

156.   Linarducci did not disclose that Investor F's investment would or could be used to make principal or interest payments to other investors.

157.   Linarducci also did not tell Investor F that her money would or could be used to fund personal purchases by Drive Planning's principals.

158.   Linarducci also failed to tell Investor F that Drive Planning did not own some of the properties that it touted as collateral for the REAL investment.

159.   Linarducci did not disclose to Investor F that he had concerns about the legitimacy of REAL at least as early as June of 2023.

**No Registration Statement**

160.   Drive Planning did not file a registration statement with the SEC for the REAL investment.

161.   No exemption to the registration requirement applied.

162.   Nevertheless, Bradford and Linarducci sold and offered promissory

notes for the REAL investment to investors in many states across the country.

163.   Bradford and Linarducci made the offers and sales of REAL personally and through the sales agents who worked for them via email, social media, video calls, and through Drive Planning's website.

164.   Many of the investments were made by investors with whom the Defendants did not have a pre-existing or substantive relationship.

**Unregistered Brokers**

165.   Bradford and Linarducci acted as unregistered brokers by selling securities in the REAL program.

166.   At the time they solicited investors in REAL, neither Bradford nor Linarducci were registered as a broker or associated with a registered broker-dealer.

167.   They directly solicited investors to purchase REAL promissory notes.

168.   Defendants received compensation based directly on those sales, including millions of dollars in commission payments.

169.   Bradford and Linarducci regularly advised investors on whether and how much to invest in REAL.  They also advised investors on whether to roll over their retirement savings into REAL.

170.   Defendants were also involved in negotiations between the issuer of the REAL promissory notes (Drive Planning) and investors.

171.   Defendants actively solicited new investors through online sources such as social media, the phone and text message, and through their networks of sales agents.

## COUNT I—FRAUD

**Violations of Section 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)(1)]
(Against Bradford and Linarducci)**

172.   Paragraphs 1 through 171 are hereby realleged and incorporated herein by reference.

173.   Beginning in or around 2020 and continuing through the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

174.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud.

175.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]
### (Against Bradford and Linarducci)

176.   Paragraphs 1 through 171 are hereby realleged and incorporated herein by reference.

177.   Beginning in or around 2020 and continuing through the present, Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

178.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act and
Sections (a), (b), and (c) of Rule 10b-5 thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]
(Against Bradford and Linarducci)**

179.   Paragraphs 1 through 171 are hereby re-alleged and are incorporated herein by reference.

180.   Between in or around 2020 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.   employed devices, schemes, and artifices to defraud;

b.   made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

181.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

182.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder
[17 C.F.R. § 240.10b-5(a), (b), and (c)]
(Against Linarducci)**

183.    Paragraphs 1 through 171 are realleged and incorporated by reference herein.

184.    As alleged above, Burkhalter and Drive Planning violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

185.    Defendant Linarducci knew, or recklessly disregarded, that Burkhalter's and Drive Planning's conduct was improper and knowingly and/or recklessly rendered to them substantial assistance in this conduct.

186.    By reason of the foregoing, Defendant Linarducci aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §

240.10b-5(a), (b), and (c)].  He did so in violation of Section 15(b) of the Securities

Act [15 U.S.C. § 77o] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t].

## COUNT V – UNREGISTERED OFFERS AND SALES OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]
### (Against Bradford and Linarducci)

187.    Paragraphs 1 through 171 are realleged and incorporated by reference

herein.

188.    By virtue of the foregoing, without a registration statement in effect as

to the REAL program, Defendants, directly and indirectly, (a) made use of the means

and instruments of transportation or communications in interstate commerce or of the

mails to sell securities through the use of medium of any prospectus or otherwise; (b)

carried or caused to be carried through the mails or in interstate commerce, by any

means or instruments of transportation, any such security for the purpose of sale or

for delivery after sale; and (c) made use of the means and instruments of

transportation or communication in interstate commerce or of the mails to offer to

sell through the use or medium of a prospectus or otherwise, securities as to which no

registration statement had been filed.

189.    By engaging in the conduct described herein, Defendants violated, and

unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act

[15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT VI – OFFERS AND SALES OF SECURITIES BY UNREGISTERED BROKERS

### Violations of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]
### (Against Bradford and Linarducci)

190.   Paragraphs 1 through 171 are realleged and incorporated by reference herein.

191.   Each Defendant, by use of the mails or means or instrumentalities of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of, securities without being registered with the Commission as a broker or dealer or as an associated person of a registered broker or dealer.

192.   By engaging in the conduct alleged above, each Defendant has violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

The Commission respectfully requests that the Court:

1.    Find that Defendants committed the violations alleged;

2.    Permanently enjoin Defendants and each of their agents, employees, and attorneys, and any other person or entity in active concert or participation with them who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of the following

provisions:  Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

3.      Order Defendants to each disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment interest thereon, pursuant to Sections 21(d)(3)(A)(ii), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

4.      Order Defendants to each pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court;

5.      Enter a conduct-based injunction under which each Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendants Bradford or Linarducci from purchasing or selling securities for their own personal accounts;

6.      Enter a conduct-based injunction against Defendant Linarducci under which he is restrained and enjoined from, directly or indirectly, acting as or being

associated with any broker or dealer – i.e., being a partner, officer, director, or branch manager of such broker or dealer (or occupying a similar status or performing similar functions), directly or indirectly controlling, being controlled by, or being under common control with such broker or dealer, or being an employee of such broker or dealer;

7.      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

8.      Order such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission demands a trial by jury as to all issues that may be so tried.

Dated:  December 19, 2025             Respectfully submitted,

/s/ Harry B. Roback
Harry B. Roback
Senior Trial Counsel
Georgia Bar No. 706790
robackh@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984
huddlestonp@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 942-0690
Facsimile: *4048427679@fax.sec.gov*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

       **Plaintiff,**

          **v.**

DAVID J. BRADFORD and GERARDO L.
LINARDUCCI,

       **Defendants.**

Civil Action File No.
1:25-cv-

## CONSENT OF DEFENDANT

1.    David J. Bradford ("Defendant"), on behalf of himself, waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over him and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 11 and except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the Consent Judgment in the form attached hereto (the "Consent Judgment") and incorporated by reference herein, which, among other things:

        a.   permanently restrains and enjoins Defendant from violation of

           Sections 5 and 17(a) of the Securities Act of 1933 ("Securities

           Act") [15 U.S.C. § 77q(a)] and Sections 15(a) and 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §
78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §
240.10b-5]; and

b. permanently restrains and enjoins Defendant from directly or
indirectly, including, but not limited to, through any entity owned
or controlled by him, participating in the issuance, purchase, offer,
or sale of any security; provided, however, that such injunction
shall not prevent him from purchasing or selling securities for his
own personal accounts.

3. Defendant agrees that the Court shall order disgorgement of ill-gotten
gains, prejudgment interest thereon, and a civil penalty against Defendant pursuant
to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of
the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendant further agrees that the
amounts of the disgorgement and civil penalty shall be determined by the Court
upon motion of the Commission, and that prejudgment interest shall be calculated
from August 13, 2024, based on the rate of interest used by the Internal Revenue
Service for the underpayment of federal income tax as set forth in 26 U.S.C.
§ 6621(a)(2). Defendant further agrees that in connection with the Commission's
motion for disgorgement and and/or civil penalties, and at any hearing held on
such a motion: (a) Defendant will be precluded from arguing that he did not violate

2

the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of this Consent or the Consent Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

4.      Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Consent Judgment.

6.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.      Defendant agrees that this Consent shall be incorporated into the Consent Judgment with the same force and effect as if fully set forth therein.

3

8. Defendant will not oppose the enforcement of the Consent Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9. Defendant waives service of the Consent Judgment and agrees that entry of the Consent Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Consent Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Consent Judgment.

10. Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.

4

Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11.     Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), he: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the

5

allegations, without also stating that Defendant does not deny the allegations; (iii)

upon the filing of this Consent, Defendant hereby withdraws any papers filed in

this action to the extent that they deny any allegation in the complaint; and (iv)

Defendant stipulates solely for purposes of exceptions to discharge set forth in

Section 523 of the Bankruptcy Code, 11 U.S.C. §523, that the allegations in the

complaint are true, and further, that any debt for disgorgement, prejudgment

interest, civil penalty or other amounts due by Defendant under the Consent

Judgment or any other judgment, order, consent order, decree or settlement

agreement entered in connection with this proceeding, is a debt for the violation by

Defendant of the federal securities laws or any regulation or order issued under

such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C.

§523(a)(19).  If Defendant breaches this agreement, the Commission may petition

the Court to vacate the Consent Judgment and restore this action to its active

docket.  Nothing in this paragraph affects Defendant's: (i) testimonial obligations;

or (ii) right to take legal or factual positions in litigation or other legal proceedings

in which the Commission is not a party.

     12.    Defendant hereby waives any rights under the Equal Access to Justice

Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any

other provision of law to seek from the United States, or any agency, or any

official of the United States acting in his or her official capacity, directly or

indirectly, reimbursement of attorney's fees or other fees, expenses, or costs

expended by Defendant to defend against this action. For these purposes,

Defendant agrees that he is not the prevailing party in this action since the parties

have reached a good faith settlement.

13.     Defendant agrees that the Commission may present the Consent

Judgment to the Court for signature and entry without further notice.

14.     Defendant agrees that this Court shall retain jurisdiction over this

matter for the purpose of enforcing the terms of the Consent Judgment.

By:

David J. Bradford

On NOVEMBER 13¹ᵗ, 2025, DAVID J. BRADFORD, a person
known to me, personally appeared before me and acknowledged executing the
foregoing Consent with full authority to do so on behalf of HIMSELF as its

Notary Public
Commission expires: 02/22/2026

Approved as to form:

Joshua Mayes
Robbins Alloy Belinfante Littlefield LLC

7

JS44 (Rev. 9/2024 NDGA)  CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

| I. (a) PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | DAVID J. BRADFORD AND GERARDO L. LINARDUCCI |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Gwinnett___
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

Harry B. Roback; Pat Huddleston II; & M. Graham Loomis - SEC 950 E Paces Ferry Rd NE, Ste 900 Atlanta, GA 30326
404.842.7600; robackh@sec.gov; loomism@sec.gov; and huddlestonp@sec.gov

**ATTORNEYS** (IF KNOWN)

Joshua Mayes
Robbins Firm

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

- [x] 1 U.S. GOVERNMENT PLAINTIFF
- [ ] 2 U.S. GOVERNMENT DEFENDANT
- [ ] 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)
- [ ] 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|
| [ ] 1 | [ ] 1 | CITIZEN OF THIS STATE | [ ] 4 | [ ] 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| [ ] 2 | [ ] 2 | CITIZEN OF ANOTHER STATE | [ ] 5 | [ ] 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| [ ] 3 | [ ] 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 6 | [ ] 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1 ORIGINAL PROCEEDING
- [ ] 2 REMOVED FROM STATE COURT
- [ ] 3 REMANDED FROM APPELLATE COURT
- [ ] 4 REINSTATED OR REOPENED
- [ ] 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)
- [ ] 6 MULTIDISTRICT LITIGATION - TRANSFER
- [ ] 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT
- [ ] 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Violations of Sections 5(a), 5(c), and 17(a) of the Securities Act 1933 [15 U.S.C. §§ 77(e), q(a)] and Sections 10(b) and 15 (a) of the Exchange Act 1934 and Rule 10b-5 thereunder [15 U.S.C. §§ 78j(b), 78o(a), and 17 C.F.R. § 240.10b-5]

- [ ] YES [ ] NO  Does the relief requested in the complaint or petition seek to bar or mandate statewide and/or nationwide enforcement of a state and/or federal law, including a rule, regulation, policy, or order of the executive branch or a state and/or federal agency, whether by declaratory judgment and/or any form of injunctive relief?

(IF COMPLEX, CHECK REASON BELOW)

- [ ] 1. Unusually large number of parties.
- [ ] 2. Unusually large number of claims or defenses.
- [ ] 3. Factual issues are exceptionally complex
- [ ] 4. Greater than normal volume of evidence.
- [ ] 5. Extended discovery period is needed.
- [ ] 6. Problems locating or preserving evidence
- [ ] 7. Pending parallel investigations or actions by government.
- [ ] 8. Multiple use of experts.
- [ ] 9. Need for discovery outside United States boundaries.
- [ ] 10. Existence of highly technical issues and proof.

**CONTINUED ON REVERSE**

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT $ _____ APPLYING IFP _____ MAG. JUDGE (IFP) _____

JUDGE _____ MAG. JUDGE _____ (Referral) NATURE OF SUIT _____ CAUSE OF ACTION _____

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK
- [ ] 880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT
- [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 485 TELEPHONE CONSUMER PROTECTION ACT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT 899
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [x] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896   ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

---

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23     DEMAND $ _____

JURY DEMAND [x] YES  [ ] NO  (CHECK YES **ONLY** IF DEMANDED IN COMPLAINT)

---

## VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE _____ Victoria M. Calvert _____     DOCKET NO. _____ 1:24-cv-03583-VMC _____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [x] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [x] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [ ] 5. REPETITIVE CASES FILED BY **PRO SE** LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

_____

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case [ ] IS  [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

---

*Harry B. Roback*                                    12/19/2025

SIGNATURE OF ATTORNEY OF RECORD                   DATE