# EXHIBIT I

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

     **Plaintiff,**

**v.**

                              **Civil Action No. 1:24-cv-03583-VMC**

**DRIVE PLANNING, LLC, and
RUSSELL TODD BURKHALTER,**

     **Defendants,**

**and**

**JACQUELINE BURKHALTER,
THE BURKHALTER RANCH
CORPORATION, DRIVE
PROPERTIES, LLC, DRIVE
GULFPORT PROPERTIES LLC,
and TBR SUPPLY HOUSE, INC.,**

     **Relief Defendants.**

_____/

## RECEIVER'S MOTION FOR TURNOVER OF AND
## IMPOSITION OF CONSTRUCTIVE TRUST ON
## REAL PROPERTY IN INDIANA TRACEABLE TO
## <u>DRIVE PLANNING, LLC AND REQUEST FOR EXPEDITED RELIEF</u>

Kenneth D. Murena, Esq., the court-appointed Receiver ("Receiver") in the

above-captioned enforcement action, seeks the expedited entry of an order, pursuant

to the Order Appointing Receiver [ECF No. 10] (the "Appointment Order"), and

applicable law, requiring the immediate turnover of real property in the possession

and titled in the name of Gerardo Lorenzo Linarducci and Jennifer Joan Linarducci, and imposing a constructive trust on such real property in favor of the receivership estate for Drive Planning, LLC (the "Receivership Estate"), and in support states:

## I.   INTRODUCTION

The Receiver seeks the immediate turnover of and the imposition of a constructive trust over the mansion located in Indianapolis, Indiana (the "Linarducci Property"), which was purchased using misappropriated investor funds of Drive Planning, LLC ("Drive Planning") and titled in the name of Gerardo Lorenzo Linarducci and Jennifer Joan Linarducci.  The Linarducci Property constitutes property of the Receivership Estate under this Court's Appointment Order.  The Receiver has attempted in good faith to resolve this matter with Mr. Linarducci, including discussions with his attorney and demands for payment or turnover of the property, all of which have been unsuccessful.

Further, the Receiver seeks expedited consideration of this motion in light of a recent communication from a neighbor of Mr. Linarducci, who reported that Mr. Linarducci stated he does not intend to turn over the property voluntarily and would "trash the place" to prevent others from benefiting from it.  While the Receiver does not know if Mr. Linarducci intends to act on this statement, his threat creates a risk of significant harm to Receivership property, and violation of the Appointment Order, warranting prompt judicial intervention.  Upon turnover and the imposition

of a constructive trust over the Linarducci Property, the Receiver intends to take possession and promptly market the property for sale for the benefit of the Receivership Estate and the defrauded investors.

## II.     BACKGROUND

On July 10, 2023, Drive Planning transferred $1,920,535.75 originating from an account containing investor funds for the purchase of the Linarducci Property. *See* Declaration of Kenneth D. Murena, as Receiver of Drive Planning, LLC ("Receiver's Declaration"), attached hereto as **Exhibit A**, at ¶ 5. Specifically, $1,920,535.75 was wired from Drive Planning's Account ending in 2951 to Title Services, LLC on July 10, 2023. *See id.* As reflected in the Receiver's Sworn Statement and Accounting, this account held the majority of Drive Planning's investor funds. *See* ECF No. 81.

The title to the Linarducci Property was transferred to Gerardo Lorenzo Linarducci and Jennifer Joan Linarducci. *See id.* at ¶ 3. Mr. Linarducci was an agent/advisor and investor of Drive Planning. *See id.* at ¶ 4. Jennifer Joan Linarducci is Mr. Linarducci's wife. The Receiver's review of Drive Planning's records did not uncover any written promissory note, mortgage, or loan agreement pursuant to which Drive Planning purchased the property for Mr. Linarducci. The Receiver, through his counsel, has requested that Mr. Linarducci produce any documentation evidencing an agreement or other arrangement with Drive Planning

concerning the property or Drive Planning's transfer of funds to purchase it; to date, no such documents have been provided.

Upon learning of the purchase of the Linarducci Property, the Receiver made several demands to Mr. Linarducci that he transfer the property to the Estate for the benefit of defrauded investors. As Mr. Linarducci has failed to comply with these demands, the Receiver seeks a Court order directing him to turn over the property and imposing a constructive trust over it in favor of the Receivership Estate as of the date Drive Planning transferred the funds for its purchase.

## III.    **MEMORANDUM OF LAW**

As Mr. Linarducci is in possession of property purchased with funds transferred directly from an account of Drive Planning containing investor funds, the Court should (i) require Mr. Linarducci and (and any other occupant including without limitation Ms. Linarducci) to immediately turn over possession and control of the Linarducci Property to the Receiver, and (ii) impose a constructive trust over the Linarducci Property in favor of the Receivership Estate and declare that the Linarducci Property is property of the Receivership Estate.

### a.  **The Court Has Jurisdiction Over the Linarducci Property.**

This Court has jurisdiction and control over all real property of the Receivership Estate, including the Linarducci Property purchased with Drive Planning funds, located in the Southern District of Indiana, pursuant to 28 U.S.C. §§

4

754 and 1962. "A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof." 28 U.S.C. § 754; *see also SEC v. Bilzerian*, 378 F.3d 1100, 1104 (D.C. Cir. 2004) (Section 754 extends "the territorial jurisdiction of the appointing court. . . to any district of the United States where property believed to be that of the receivership estate is found, provided that the proper documents have been filed in each such district as required by § 754.") (*citing Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 823 (6th Cir. 1981). To establish such jurisdiction, the Receiver must "within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located." 28 U.S.C. §754. The Receiver complied with 28 U.S.C. §754 by filing a copy of the Complaint [ECF No. 1] and the Appointment Order [ECF No. 10] in the Southern District of Indiana within ten days of the entry of the Appointment Order. *See* S.D. Ind. Case No. 1:24-mc-00046-JRS-MKK at ECF No. 1 ("S.D. Ind. 754 Action").

When 28 U.S.C. §754 applies, its companion statute, 28 U.S.C. § 1692, is triggered. Section 1692 effectively expands the territorial jurisdiction of the court that appoints the receiver to any district in the United States where property believed to be that of the receivership estate is found, provided that the proper documents

have been filed in each such district as required by §754. *See* 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts."); *see also Bilzerian*, 378 F.3d at 1104 (finding that personal jurisdiction is established by the nationwide service of process authorized in receivership proceedings by 28 U.S.C. § 1692, under which "[t]he appointment court's process extends to any judicial district where receivership property is found." (*quoting Haile*, 657 F.2d at 826)). Further, Federal Rule of Civil Procedure 4(k)(1)(C) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute.".

Therefore, because the Receiver has filed the Appointment Order in the S.D. Ind. 754 Action and recorded it in the county in which the Property is located (*see* Receiver's Declaration at ¶ 11), and has served this Motion and the Appointment Order on Mr. Linarducci and Ms. Linarducci through their counsel, this Court has personal jurisdiction over that Property, pursuant to 28 U.S.C. § 1692 and Fed. R. Civ. P. 4(k)(1)(C).

**b.** **The Receiver's Claim for Constructive Trust Is Proper Because It Is Based on Harm to the Receivership Entity (Drive Planning), not Investors.**

A receiver has standing to bring a constructive trust claim because it represents the legal interests of the entities in receivership, which are distinct from the interests of individual investors in a Ponzi scheme. *See Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014) ("[a] receiver of entities used to perpetrate a Ponzi scheme does not have standing to sue on behalf of the defrauded investors but does have standing to sue on behalf of the corporations that were injured by the Ponzi scheme operator"). Here, the Receiver's claim for a constructive trust arises from the direct harm to Drive Planning, LLC ("Drive Planning") as a result of Mr. Burkhalter transferring funds from Drive Planning's accounts to purchase the Linarducci Property for Mr. Linarducci, wrongfully diverting them for the improper purpose of depriving Drive Planning of its assets and unjustly enriching Mr. Linarducci. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1310 (11th Cir. 2024) (finding that receiver had standing to maintain fraudulent-transfer claims against brokers because those transfers injured the receivership corporate entities).

Even though the entities involved in the Ponzi scheme were used as tools by the schemer, they are still considered separate legal entities with their own rights and duties. *See Wiand v. Lee*, 753 F.3d at 1202. These entities are harmed when their assets are diverted for unauthorized purposes, such as perpetuating the Ponzi

7

scheme, rather than being used for their stated purpose, such as investing on behalf of investors. *See id.*

Once a receiver is appointed, the entities in receivership are no longer under the "evil zombie" control of the Ponzi schemer, but are "freed from his spell," and are entitled to recover assets that were improperly transferred from the entities. *See id.* at 1201-1203; *see also Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1310 (11th Cir. 2024) (finding that receiver had standing to maintain fraudulent-transfer claims against brokers because those transfers injured the receivership corporate entities). A receiver has standing to pursue constructive trust claims on behalf of the receivership entities, as opposed to individual investors who are considered tort creditors of the entities and do not have direct claims to recover the diverted assets from the parties to which they were improperly transferred. *See id.*

### c. <u>Court Orders Require Turnover of Linarducci Property to Receiver.</u>

Based on the findings in this Court's Orders, because the Linarducci Property was purchased with funds transferred directly from an account of Drive Planning containing investor funds, and Mr. Linarducci has refused to turn over the property to the Receiver or repay the amount transferred to purchase it, despite the Receiver's demands, the Court should compel Mr. Linarducci to immediately turn over the property to the Receiver.

### i.  Preliminary Injunction

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief against Drive Planning, LLC and Russell Todd Burkhalter, alleging they operated a massive Ponzi scheme under the guise of a real estate investment program.  *See* ECF No. 1.

The SEC also filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and the continued defrauding of investors.  *See* ECF No. 2.  In its motion, the SEC presented evidence to show that, from September 2020 through June 2024, over 2,500 investors residing in at least 48 states invested approximately $372 million based on promises of unrealistically high returns from real estate ventures.  *See id.* at pp. 5-6.  Defendants primarily used new investor funds to pay earlier investors, in typical Ponzi fashion, with more than $280 million still being owed to investors.  *See id.* at pp. 4-6.

Based on the foregoing, and other evidence presented in the SEC's motion, the Court entered a Preliminary Injunction Freezing Assets and Granting Other Equitable Relief (the "Preliminary Injunction"), freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting of the Defendant's assets and activities, among other things. *See* ECF No. 11 at ¶ 4.  In the Preliminary Injunction, the Court found that the SEC

had presented sufficient evidence to support a *prima facie* case that Mr. Burkhalter and Drive Planning had violated federal securities laws by making material misrepresentations and misappropriating investor funds. *See id.* at ¶ 2. The Court further found that the Relief Defendants improperly received funds derived from the fraudulent activities. *See id.* at ¶ 4.

### ii. Appointment Order

Also on August 13, 2024, the Court entered the Appointment Order, appointing Kenneth D. Murena, Esq. as the Receiver over Drive Planning and all assets owned by, or purchased with funds derived from investors or clients of, Drive Planning. *See* ECF No. 10. The Court found that the appointment of a Receiver was necessary to marshal, preserve, and recover assets derived from fraudulent activities tied to the Defendants' alleged Ponzi scheme. *See id.* at pp. 1-2. The Receiver was authorized and directed to take "exclusive jurisdiction and possession of the assets, whatever kind and wherever situated" of Drive Planning and "take immediate possession of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests . . .." ECF No. 10 at ¶¶ 1, 19. Moreover, the Receiver was tasked with, *inter alia*, securing assets ***acquired with or otherwise traceable to investor funds***, managing the Receivership Estate, and liquidating assets for the benefit of defrauded investors. *See id.* at ¶¶ 4-7 (emphasis added).

### iii. Final Judgment against Defendant Burkhalter

On April 10, 2025, the Court entered a Judgment as to Defendant Russell Todd Burkhalter (the "Judgment"), based on Defendant Burkhalter's having consented to the Court's jurisdiction over him and the subject matter of this action, consented to the entry of the Judgment without admitting or denying the allegation of the Complaint, and waived findings of fact and conclusions of law and any right to appeal from the Judgment. *See* ECF No. 102. The Judgment permanently enjoined Defendant Burkhalter from violating sections of the Securities Act and the Exchange Act and certain rules promulgated thereunder and prohibited Mr. Burkhalter from engaging in various actions that are the subject of the SEC's Complaint. Further, the Judgment ordered Defendant Burkhalter to pay disgorgement of ill-gotten gains, interest, and a civil penalty, in amounts to be determined upon motion of the SEC.

With Defendant Burkhalter's liability as to the claims alleged in the SEC's Complaint having been established, and the findings and mandates in the Preliminary Injunction and Appointment Order effectively becoming permanent, the Receiver is entitled to take immediate possession of and to liquidate for the benefit of the defrauded investors all assets acquired with or otherwise traceable to Drive Planning investor funds. As such, given that the Linarducci Property was acquired with funds transferred directly from an account of Drive Planning containing

investor funds, the Receiver is authorized to take immediate possession of that property.  Because Mr. Linarducci has refused to turn over the Linarducci Property to the Receiver or repay the entire amount of investor funds that Drive Planning had transferred to purchase the property, the Court should compel Mr. Linarducci to turn over the property so the Receiver can liquidate it for the benefit of the investors.

    **d.**   **Controlling Law Imposes a Constructive Trust Over the Linarducci Property in Favor of Receivership Estate Because It Was Purchased with Funds Fraudulently Obtained from Innocent Investors.**

Courts in Indiana[1] have explained, a constructive trust is a creature of equity, devised to do justice by making equitable remedies available against one who through fraud or other wrongful means acquires property of another.  *See Criss v. Bitzegaio*, 420 N.E.2d 1221, 1224 (Ind. 1981).

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which

---

[1] In constructive trust cases involving real property, federal and state courts in Georgia generally follow the traditional conflict of law rule of *lex loci rei sitae,* that is, the law of the place where the thing is. *See United States v. One 1990 Lincoln Town Car*, 817 F. Supp. 1575, 1577 (N.D. Ga. 1993) (applying Alabama law to a constructive trust issue because the property in question was located in Alabama)*; see also Veach v. Veach,* 205 Ga. 185, 190, 53 S.E.2d 98 (1949).

would result if the person having the property were permitted to retain it.

*Melloh v. Gladis*, 261 Ind. 647, 656, 309 N.E.2d 433, 438-39 (1974).

Constructive fraud "arises by operation of law from a course of conduct which, if sanctioned by law, would 'secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud.'" *Paramo v. Edwards*, 563 N.E.2d 595, 598 (Ind. 1990) (*quoting Beecher v. City of Terre Haute*, 235 Ind. 180, 184-85, 132 N.E.2d 141, 143 (1956)). It is "based on the premise that there are situations which might not amount to actual fraud, but which are 'so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent.'" *Stoll v. Grimm*, 681 N.E.2d 749, 757 (Ind. Ct. App. 1997) (*quoting Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991)).

The law of constructive trusts has evolved to recognize that, if the person seeking to impose the constructive trust can trace not only the original *res*, but also successive funds or property into which the original *res* has been transformed, then the party may still impose the constructive trust. *See* Hicks v. State, 635 N.E.2d 1151, 1156 (Ind. Ct. App. 1994) (upholding the imposition of constructive trusts over bank accounts containing stolen funds, emphasizing that tracing the funds into those accounts was essential to prevent unjust enrichment and facilitate restitution to the rightful owners). Therefore, tracing is a basic requirement and element of proof for one seeking to impose a constructive trust.

13

Here, the Receiver has traced investor funds deposited for investment in Drive Planning to the purchase of the Linarducci Property. *See* Receiver's Declaration at ¶¶ 5-8. In particular, the Receiver identified a wire transfer on July 10, 2023, in the amount of $1,920,535.75 from Drive Planning's account holding funds derived from investors to Title Services, LLC. *See id*. Those funds were used to purchase the Linarducci Property, and the title to the property was transferred to Gerardo Linarducci and Jennifer Linarducci. *See id*. at ¶ 8. Drive Planning had obtained those funds through fraudulent means and misappropriated them for the personal use of Mr. Linarducci. *See* ECF No. 11 at ¶¶ 2, 4; Receiver's Declaration at ¶ 6; *see also Kalwitz v. Estate of Kalwitz,* 822 N.E.2d 274, 280 (Ind. Ct. App. 2005) (finding that fraud, either actual or constructive, is a prerequisite for the imposition of a constructive trust). Indeed, Drive Planning obtained funds from investors by misrepresenting how they would be invested and then misappropriated those funds by, among other things, transferring them (sometimes pursuant to promissory notes) for the purchase of valuable assets including real properties for its agents/advisors such as Mr. Linarducci. *See* ECF No. 11 at ¶¶ 2, 4; Receiver's Declaration at ¶ 6. To prevent the unjust enrichment of Mr. Linarducci at the expense of Drive Planning and the defrauded investors whose funds were used to purchase the Linarducci Property, the law provides that the Linarducci Property is subject to a constructive

trust in favor of the Receivership Estate of Drive Planning for the benefit of those defrauded investors.

This Court created the Receivership Estate to marshal and safeguard assets of the Drive Planning investors. As such, the Court should impose a constructive trust over the Linarducci Property in favor of the Estate, for the benefit of the investors, and compel Mr. Linarducci to turn over exclusive possession and control of the property to the Receiver.

### e. **A Constructive Trust Was Impressed Upon the Funds Used to Purchase the Linarducci Property at the Time Those Funds Were Fraudulently Obtained, Before the Linarducci Property Was Purchased and Titled in Name of the Linarduccis**

A constructive trust arises by operation of law when one holding legal title to property cannot in good conscience retain the beneficial interest in that property, which justly belongs to another. *See Kalwitz*, 822 N.E.2d at 282. As established above, Drive Planning had fraudulently obtained the funds used to purchase the Linarducci Property. *See* ECF No. 11 at ¶¶ 2, 4; Receiver's Declaration at ¶ 6. Therefore, a constructive trust arose in favor of the defrauded investors at the time Drive Planning had fraudulently obtained their funds, *i.e.*, *before* the Linarducci Property was purchased using their funds transferred from a Drive Planning account and *before* it was titled in the name of Gerardo Linarducci and Jennifer Linarducci.

As such, because no individual or entity has a competing lien on or other claim to the Linarducci Property, *see* Receiver's Declaration at ¶ 9, the Court should

impose a constructive trust in favor of the Receivership Estate (for the benefit of the defrauded investors) upon the Linarducci Property, which was acquired with the fraudulently obtained funds over which a constructive trust was already impressed as a result of Drive Planning's fraudulent acquisition thereof.

## IV. <u>CONCLUSION</u>

The Receiver's request for turnover of and the imposition of a constructive trust over the Linarducci Property is in accord with the law in this District and in the State of Indiana (which applies given the property's location), principles of equity, and the Appointment Order and Preliminary Injunction. Drive Planning defrauded thousands of innocent investors out of hundreds of millions of dollars and used a portion of their funds, earmarked for investment in Drive Planning's real estate acceleration loan or tax lien programs, to purchase the Linarducci Property. Fortunately, applicable law and principles of equity impress upon that property (even homestead) a constructive trust and equitable lien in favor of the Receivership Estate for the benefit of the defrauded investors so the Receiver may take exclusive possession and control of the property and liquidate it for the benefit of those victims.

## <u>CERTIFICATION OF CONFERENCE</u>

The undersigned counsel certifies that prior to filing this motion the Receiver conferred with counsel for the SEC, and undersigned counsel conferred with counsel for Defendant Burkhalter and counsel for Relief Defendants, regarding the relief

requested herein and such counsel informed the Receiver or undersigned counsel that they have no opposition to the requested relief. Undersigned counsel also conferred with Gerardo Linarducci's counsel, who confirmed that Mr. Linarducci objects to the requested relief.

WHEREFORE, the Receiver respectfully requests that this Court enter an order: (i) requiring the immediate turnover of possession and control of the Linarducci Property to the Receiver; (ii) imposing a constructive trust over the Linarducci Property in favor of the Receivership Estate and/or declaring that it is property of the Estate and thus subject to exclusive possession, control, and/or liquidation by the Receiver; (iii) ordering Mr. Linarducci, Ms. Linarducci, and any other occupant of the Linarducci Property to vacate the premises upon a date certain not to exceed 30 days from entry of this Court's order; (iv) authorizing the Receiver to market and sell the Linarducci Property; and (v) directing Mr. Linarducci and Ms. Linarducci to cooperate with, and provide any information or signatures needed by the Receiver to preserve the value of the Linarducci Property and effect its sale and transfer.

Respectfully submitted,

s/*Russell Landy*
Russell Landy, Esq.
Florida Bar No. 44417
*Admitted Pro Hac Vice*

*Lead Counsel for Kenneth D. Murena,*
*as Court-Appointed Receiver*
Adriana M. Pavon
 Florida Bar No. 1025060
 apavon@dvcattorneys.com
*Admitted Pro Hac Vice*
Russell Landy
 Florida Bar No. 44417
 rlandy@dvllp.com
*Admitted Pro Hac Vice*
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*Local Counsel for Kenneth D. Murena,*
*as Court- Appointed Receiver*
Henry F. Sewell, Jr.
 Georgia Bar No. 636265
 Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

## CERTIFICATE OF SERVICE, FONT AND MARGINS

  I hereby certify that on June 12, 2025, I electronically filed the foregoing Motion using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record and served Gerardo Lorenzo Linarducci the foregoing Motion through his counsel Stephen D. Councill at scouncill@cgc-law.com.

  I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

 Dated: June 12, 2025.

s/*Russell Landy*
Russell Landy, Esq.
Florida Bar No. 44417
*Admitted Pro Hac Vice*

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

Civil Action No. 1:24-cv-03583-VMC

**DRIVE PLANNING, LLC, and
RUSSELL TODD BURKHALTER,**

**Defendants,**

**and**

**JACQUELINE BURKHALTER,
THE BURKHALTER RANCH
CORPORATION, DRIVE
PROPERTIES, LLC, DRIVE
GULFPORT PROPERTIES LLC,
and TBR SUPPLY HOUSE, INC.,**

**Relief Defendants.**

_____/

## DECLARATION OF COURT-APPOINTED RECEIVER
## KENNETH D. MURENA

I, Kenneth D. Murena, state as follows:

1.     I am over 18 years of age, am a resident of Miami-Dade County,

Florida, and am competent to make this declaration upon knowledge I have

gathered pursuant to my appointment and in my role as Receiver of Drive Planning,

LLC ("Drive Planning") in the above-captioned matter pursuant to the Order Appointing Receiver [ECF No. 10] (the "Appointment Order").

2.     My attorneys, forensic accountants, and I investigated the purchase and ownership of the Linarducci Property[1] by reviewing bank account statements, wire confirmations, public records, and a forensic reconstruction of accounts and transactions of Drive Planning to trace the funds used to purchase the Linarducci Property.

3.     I confirmed that on July 10, 2023, a Warranty Deed was executed and recorded in the public record by the Grantors Joseph M. Schuller and Monika A. Schuller, collectively transferring their respective interests in the property located in Indianapolis, Indiana (*i.e.*, the Linarducci Property), to Gerardo Lorenzo Linarducci and Jennifer Joan Linarducci. *See* Warranty Deed, attached as **Exhibit 1**.

4.     Gerardo Linarducci was a high-ranking agent/advisor of Drive Planning who received millions of dollars from Drive Planning presumably as commissions for procuring investors.

5.     My review of Drive Planning's Truist Bank statements confirmed that on July 10, 2023, $1,920,535.75 was transferred from Drive Planning's Truist

---

[1] Defined terms contained in this declaration have the same meaning as those in my motion for constructive trust to which this Declaration is an exhibit.

account no. ending in 2951 to Title Services, LLC. The details of this wire transaction are as follows:

| Account | Trans. Date | Type | Name | Paid to | Description/Transaction Memo |
|---------|-------------|------|------|---------|------------------------------|
| ***2951 | 07/10/23 | Wire | TITLE SERVICES, LLC ESCROW ACCOUNT | $1,920,535.75 | GERARDO LORENZO AND JENNIFER ,JOAN LINARDUCCI .. FILE# 41633 |

6.      At the time the $1,920,535.750 was transferred from Drive Planning's Truist account no. ending in 2951 for the purchase of the Linarducci Property, Drive Planning's account contained millions of dollars of Drive Planning investor funds and was used by Drive Planning to receive and disburse investor funds. *See* ECF No. 81.

7.      The transfer of funds from Drive Planning was used to purchase the Linarducci property. *See* Settlement Statement, attached as **Exhibit 2**.

8.      Drive Planning alone paid the purchase price for the Linarducci Property with funds that investors had deposited into Drive Planning's account for the purpose of investing in a Drive Planning investment program.

9.      According to my review of the public records, no purchase money mortgage was used to purchase the Linarducci Property.

10.     In addition to the $1,920,535.750 transfer to purchase the Linarducci Property, Mr. Linarducci received from Drive Planning transfers totaling $6,274,685.41, presumably as commissions for bringing in investors. *See*

Linarducci Transactions, attached as **Exhibit 3**.

11.     On August 20, 2024, the SEC's Complaint in this enforcement action and the Appointment Order were filed in the Southern District of Indiana, commencing a miscellaneous action in the district in which the Linarducci Property is located in accordance with 28 U.S.C. § 754.  *See* Notice of Filing Complaint and Order Appointing Receiver, attached as **Exhibit 4**.  On May 23, 2025, the Appointment Order was recorded in Marion County.  *See* Certified CM/ECF Document, attached as **Exhibit 5**.

Under penalties of perjury, I declare that I have read the foregoing and that the facts contained therein are true and correct.

*/s/ Kenneth D. Murena*
Kenneth D. Murena
June 12, 2025

**EXHIBIT 1**

JOSEPH P. O'CONNOR
MARION COUNTY ASSESSOR
**Jul 13 2023 AM 11:22**
DULY ENTERED FOR TAXATION
SUBJECT TO FINAL ACCEPTANCE
FOR TRANSFER
E-033039883 CE

4/16 33

**A202300057630**

**07/14/2023 07:07 AM**
**FAITH KIMBROUGH**
**MARION COUNTY IN RECORDER**
**FEE: $ 35.00**
**PAGES: 2**
**By: ER**

## WARRANTY DEED

JR

THIS INDENTURE WITNESSETH, that **JOSEPH M. SCHULLER and MONIKA A. SCHULLER**, husband and wife (collectively, the **"Grantor"**) of Marion County, Indiana, CONVEY AND WARRANT to **GERARDO LORENZO LINARDUCCI and JENNIFER JOAN LINARDUCCI**, husband and wife (collectively, the **"Grantee"**), of Marion County, Indiana, for the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the following described real estate in Marion County, State of Indiana:

Lot 143 in Admirals Pointe, Section 6, an addition in Marion County, Indiana as per plat thereof recorded February 23, 1987, as Instrument No. 87-19405 in the Office of the Recorder of Marion County, Indiana.

Subject to any and all easements, agreements, covenants, restrictions and rights-of-way of record, and to all current and non-delinquent real estate taxes due and payable from and after the date of this conveyance.

[County Tax Parcel No.: 4027281]
[State Tax Parcel No.: 49-01-15-125-002.000-400]

**PRIOR DEED REFERENCE:** **Instrument No. A201200102972**

Common street address is 12162 Pearl Bay Ridge, Indianapolis, Indiana, 46236.

IN WITNESS WHEREOF, the Grantor has executed this Warranty Deed on this 10 day of July, 2023.

"GRANTOR"

JOSEPH M. SCHULLER

MONIKA A. SCHULLER

Marion County Assessor
Jul 13 2023
Received CB

# EXHIBIT 2

| American Land Title Association | ALTA Settlement Statement - Cash |
|---|---|
| | Adopted 05-01-2015 |

**File No./Escrow No.:** 41633
**Print Date & Time:** 07/06/23 10:24 AM
**Officer/Escrow Officer:** Joann Chambers
**Settlement Location:**
Title Services LLC
9201 N. Meridian Street
Indianapolis, IN 46260

Title Services, LLC
**ALTA Universal ID:** 1017366
9201 N. Meridian Street
Suite 100
Indianapolis, IN 46260

**Property Address:** Lot 143, Admirals Pointe, Section 6, Marion County, IN
12162 Pearl Bay Ridge
Indianapolis, IN 46236

**Borrower:** Gerardo Lorenzo Linarducci and Jennifer Joan Linarducci, husband and wife

**Seller:** Joseph M. Schuller and Monika A. Schuller, husband and wife
12162 Pearl Bay Ridge
Indianapolis, IN 46236

**Loan Number:**
**Settlement Date:** 07/10/2023
**Disbursement Date:** 07/10/2023
**Additional dates per state requirements:**

| Seller | | Description | Borrower/Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Financial** | | |
| | $1,950,000.00 | Sale Price of Property | $1,950,000.00 | |
| | | Deposit | | $20,000.00 |
| | | | | |
| | | **Prorations/Adjustments** | | |
| | $92.26 | Solid Waste/Storm Water from 07/10/2023 thru 12/31/2023 | $92.26 | |
| | $227.74 | HOA Dues from 07/10/2023 thru 12/31/2023 | $227.74 | |
| $6,284.25 | | County Property Taxes from 01/01/2023 thru 07/09/2023 | | $6,284.25 |
| $6,000.00 | | Seller Inspection Repair Credit | | $6,000.00 |
| | | | | |
| | | **Other Loan Charges** | | |
| | | Appraisal Fee | | |
| | | Credit Report | | |
| | | Flood Certification | | |
| | | Tax Service Fee | | |
| | | | | |
| | | **Title Charges & Escrow / Settlement Charges** | | |
| | | Title - ALTA 5 PUD Endorsement to Title Services LLC | | |
| | | Title - ALTA 8.1 Endorsement to Title Services LLC | | |
| | | Title - ALTA 9 CCR Endorsement to Title Services LLC | | |
| $180.00 | | Title - Closing Fee to Title Services LLC | $180.00 | |
| | | Title - Closing Protection Letters to Old Republic National | $25.00 | |

Copyright 2015 American Land Title Association.
All rights reserved.

File # 41633
Printed on: 07/06/23 10:24 AM

| Seller | | Description | Borrower/Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | Title | | |
| | | Title - Simplifile Electronic Record Fee to Simplifile | $4.00 | |
| | | Title - TIEFF Fee to Old Republic National Title Ins. | | |
| | | Title - Title Admin Fee to Title Services LLC | | |
| $50.00 | | Title - Bank Charges to Title Services LLC | | |
| $25.00 | | Title - Closing Protection Letter to Old Republic National Title | | |
| | | Title - Courier Fee to Title Services LLC | | |
| $2,128.50 | | Title - Owner's Title Insurance($4,257.00) to Title Services LLC | $2,128.50 | |
| $162.50 | | Title - Search & Exam Fee to Title Services LLC | $162.50 | |
| $5.00 | | Title - TIEFF Fee to Old Republic National Title Ins. | | |
| | | | | |
| | | **Commission** | | |
| $39,000.00 | | Real Estate Commission - Buyer's Realtor to Compass Indiana, LLC | | |
| $39,000.00 | | Real Estate Commission - Listing to F. C. Tucker Co. 06 | | |
| | | $20000.00 Earnest Money Held by F. C. Tucker Co. 06 | | |
| $255.00 | | Real Estate Commission Fee to F. C. Tucker Co. 06 | | |
| | | | | |
| | | **Government Recording and Transfer Charges** | | |
| | | Auditor Sale Disclosure Fee to Auditor County | | |
| | | | | |
| | | **Payoff(s)** | | |
| $422,870.58 | | Lender:  Payoff of First Mortgage Loan to FORUM Credit Union | | |
| | | Total ($422,870.58) | | |
| | | | | |
| | | **Miscellaneous** | | |
| $85.00 | | Attorney Fee- deed & affidavit to Lawson J Clark, II | | |
| | | Home Warranty to N/A | | |
| $95.00 | | Homeowners Assoc Legacy Acct Closure Fee to Community Association Services Of Indiana | | |
| $6,133.19 | | Real Estate Property Taxes Fall 22/23 to Marion County Treasurer | | |
| | | Survey Fee to Waived | | |
| **Seller** | | | **Borrower/Buyer** | |
| **Debit** | **Credit** | | **Debit** | **Credit** |
| $522,274.02 | $1,950,320.00 | **Subtotals** | $1,952,820.00 | $32,284.25 |
| | | Due **From** Borrower | | **$1,920,535.75** |
| **$1,428,045.98** | | Due **To** Seller | | |
| $1,950,320.00 | $1,950,320.00 | **Totals** | $1,952,820.00 | $1,952,820.00 |

Copyright 2015 American Land Title Association.
All rights reserved.

File # 41633
Printed on: 07/06/23 10:24 AM

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Title Services, LLC to cause the funds to be disbursed in accordance with this statement.

_____       _____
Gerardo Lorenzo Linarducci                        Date

_____       _____
Jennifer Joan Linarducci                              Date

_____       _____
Joseph M. Schuller                                       Date

_____       _____
Monika A. Schuller                                       Date

_____       _____
Joann Chambers                                                             Date

# EXHIBIT 3

## Gerardo Linarducci Transcations

**Commissions**

| Account | Trans. Date | Type | Name | Received From | Paid to |
|---|---|---|---|---|---|
| ADP | 08/12/22 | DD | Linarducci, Gerardo | | $40,690.00 |
| ADP | 08/26/22 | DD | Linarducci, Gerardo | | $12,705.00 |
| ADP | 09/09/22 | DD | Linarducci, Gerardo | | $38,160.00 |
| ADP | 09/23/22 | DD | Linarducci, Gerardo | | $22,730.00 |
| ADP | 10/07/22 | DD | Linarducci, Gerardo | | $5,150.00 |
| ADP | 10/21/22 | DD | Linarducci, Gerardo | | $10,923.73 |
| ADP | 11/04/22 | DD | Linarducci, Gerardo | | $15,988.00 |
| ADP | 11/18/22 | DD | Linarducci, Gerardo | | $33,696.00 |
| ADP | 12/02/22 | DD | Linarducci, Gerardo | | $38,571.00 |
| ADP | 12/16/22 | DD | Linarducci, Gerardo | | $42,222.00 |
| ADP | 12/30/22 | DD | Linarducci, Gerardo | | $7,078.50 |
| ADP | 01/13/23 | DD | Linarducci, Gerardo | | $400.00 |
| ADP | 01/27/23 | DD | Linarducci, Gerardo | | $43,537.19 |
| ADP | 02/10/23 | DD | Linarducci, Gerardo | | $20,933.00 |
| ADP | 02/24/23 | DD | Linarducci, Gerardo | | $47,446.75 |
| ADP | 03/10/23 | DD | Linarducci, Gerardo | | $90,048.00 |
| ADP | 03/24/23 | DD | Linarducci, Gerardo | | $84,476.00 |
| ADP | 04/07/23 | DD | Linarducci, Gerardo | | $31,499.80 |
| ADP | 04/21/23 | DD | Linarducci, Gerardo | | $56,215.00 |
| ADP | 05/05/23 | DD | Linarducci, Gerardo | | $61,064.00 |
| ADP | 05/19/23 | DD | Linarducci, Gerardo | | $108,313.85 |
| ADP | 06/02/23 | DD | Linarducci, Gerardo | | $62,052.00 |
| ADP | 06/16/23 | DD | Linarducci, Gerardo | | $123,294.00 |
| ADP | 06/30/23 | DD | Linarducci, Gerardo | | $94,002.00 |
| ADP | 07/14/23 | DD | Linarducci, Gerardo | | $70,302.00 |
| ADP | 07/28/23 | DD | Linarducci, Gerardo | | $98,518.00 |
| ADP | 08/11/23 | DD | Linarducci, Gerardo | | $124,405.00 |
| ADP | 08/25/23 | DD | Linarducci, Gerardo | | $84,887.00 |
| ADP | 09/08/23 | DD | Linarducci, Gerardo | | $93,011.00 |
| ADP | 09/22/23 | DD | Linarducci, Gerardo | | $167,478.80 |
| ADP | 10/06/23 | DD | Linarducci, Gerardo | | $138,179.00 |
| ADP | 10/20/23 | DD | Linarducci, Gerardo | | $101,227.00 |
| ADP | 11/03/23 | DD | Linarducci, Gerardo | | $101,310.00 |
| ADP | 11/17/23 | DD | Linarducci, Gerardo | | $162,737.00 |
| ADP | 12/01/23 | DD | Linarducci, Gerardo | | $133,884.00 |
| ADP | 12/15/23 | DD | Linarducci, Gerardo | | $177,206.00 |
| ADP | 12/29/23 | DD | Linarducci, Gerardo | | $218,746.00 |
| ADP | 01/12/24 | DD | Linarducci, Gerardo | | $67,209.00 |
| ADP | 01/26/24 | DD | Linarducci, Gerardo | | $217,582.00 |
| ADP | 02/09/24 | DD | Linarducci, Gerardo | | $202,353.00 |
| ADP | 02/23/24 | DD | Linarducci, Gerardo | | $202,951.00 |
| ADP | 03/08/24 | DD | Linarducci, Gerardo | | $201,518.00 |
| ADP | 03/22/24 | DD | Linarducci, Gerardo | | $339,404.00 |
| ADP | 04/05/24 | DD | Linarducci, Gerardo | | $392,127.00 |
| ADP | 04/19/24 | DD | Linarducci, Gerardo | | $335,583.00 |
| ADP | 05/03/24 | DD | Linarducci, Gerardo | | $257,830.00 |
| ADP | 05/17/24 | DD | Linarducci, Gerardo | | $329,114.00 |
| ADP | 05/31/24 | DD | Linarducci, Gerardo | | $288,853.00 |
| ADP | 06/14/24 | DD | Linarducci, Gerardo | | $299,393.00 |
| | | | | $0.00 | $5,897,003.62 |

**Other**

| Account | Trans. Date | Type | Name | Received From | Paid to |
|---|---|---|---|---|---|
| 1100009132951 | 07/26/22 | Wire | Gerardo Linarducci | | $120,000.00 |
| 1100009132951 | 08/03/22 | Wire | Gerardo L Linarducci | $50,000.00 | |
| 1100009132951 | 08/29/22 | Wire | Chrystine A Calhoun | $30,000.00 | |
| 1100009132951 | 09/01/22 | Deposit | Gerardo L Linarducci | $110,000.00 | |
| 1100009132951 | 09/14/22 | Deposit | Gerardo L Linarducci | $25,000.00 | |
| 1100009132951 | 09/26/22 | Wire | Gerardo Linarducci | | $3,394.04 |
| 1100009132951 | 11/03/22 | Wire | Gerardo Linarducci | | $5,000.00 |
| 1100009132951 | 01/10/23 | Deposit | Gerardo L Linarducci | $52,000.00 | |
| 1100009132951 | 01/20/23 | Wire | Gerardo Linarducci | | $49,213.75 |
| 1100009132951 | 03/16/23 | Deposit | Gerardo L Linarducci | $35,000.00 | |
| 1100009132951 | 04/07/23 | Wire | Gerardo Linarducci | | $12,574.00 |
| 1100009132951 | 04/17/23 | Deposit | Gerardo L Linarducci | $28,000.00 | |
| 1100009132951 | 06/02/23 | Wire | Gerardo Linarducci | | $46,000.00 |
| 1100009132951 | 06/09/23 | Deposit | Gerardo L Linarducci | $10,000.00 | |
| 1100009132951 | 06/15/23 | Wire | Gerardo Linarducci | | $8,000.00 |

| Account | Trans. Date | Type | Name | Received From | Paid to |
|---|---|---|---|---|---|
| 1100009132951 | 06/20/23 | Wire | Gerardo Linarducci | | $8,500.00 |
| **1100009132951** | **07/10/23** | **Wire** | **TITLE: SERVICES , LLC ESCRCOW ACCOUNT** | | **$1,920,535.75** |
| 1100009132951 | 07/18/23 | Deposit | Gerardo L Linarducci | $10,000.00 | |
| 1100009132951 | 08/17/23 | Deposit | Gerardo & Jennifer Linarducci | $20,000.00 | |
| 1100009132951 | 08/22/23 | Deposit | Gerardo & Jennifer Linarducci | $10,000.00 | |
| 1100009132951 | 08/22/23 | Deposit | Gerardo & Jennifer Linarducci | $10,000.00 | |
| 1100009132951 | 09/12/23 | Deposit | Gerardo & Jennifer Linarducci | $20,000.00 | |
| 1100009132951 | 09/12/23 | Deposit | Gerardo & Jennifer Linarducci | $20,000.00 | |
| 1100009132951 | 10/02/23 | Deposit | Gerardo & Jennifer Linarducci | $20,000.00 | |
| 1100009132951 | 10/11/23 | Deposit | Gerardo & Jennifer Linarducci | $30,000.00 | |
| 1100009132951 | 12/20/23 | Wire | New Vision Trust Company Escrow | $13,500.00 | |
| 1100009132951 | 03/01/24 | Wire | Gerardo Linarducci | | $25,000.00 |
| | | | | $493,500.00 | $2,198,217.54 |

**Affiliated**

| Account | Trans. Date | Type | Name | Received From | Paid to |
|---|---|---|---|---|---|
| 1100009132951 | 11/09/23 | Deposit | Ducci Enterprise LLC | $20,000.00 | |
| 1100009132951 | 11/16/23 | Deposit | Ducci Enterprise LLC | $3,000.00 | |
| 1100009132951 | 12/12/23 | Deposit | Ducci Enterprise LLC | $20,000.00 | |
| 1100009132951 | 01/02/24 | Wire | Ducci University | | $100,000.00 |
| 1100009132951 | 01/09/24 | Deposit | Ducci Enterprise LLC | $40,000.00 | |
| 1100009132951 | 02/08/24 | Deposit | Ducci Enterprise LLC | $40,000.00 | |
| 1100009132951 | 02/29/24 | Deposit | Ducci Enterprise LLC | $6,000.00 | |
| 1100009132951 | 03/07/24 | Deposit | Ducci Legacy LLC | $50,000.00 | |
| 1100009132951 | 04/10/24 | Deposit | Ducci Enterprise LLC | $100,000.00 | |
| 1100009132951 | 05/07/24 | Deposit | Ducci Enterprise LLC | $100,000.00 | |
| 1100009132951 | 05/29/24 | Deposit | Ducci Enterprise LLC | $10,000.00 | |
| | | | | $389,000.00 | $100,000.00 |

| | | |
|---|---|---|
| Total | $882,500.00 | $8,195,221.16 |

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

**FILED**

**AUG 20 2024**

U.S. DISTRICT COURT
INDIANAPOLIS, INDIANA

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

      Plaintiff,

v.

Civil Action No. _____

DRIVE PLANNING, LLC, and
RUSSELL TODD BURKHALTER,

      Defendants,

And

1:24-mc-46-JRS-MKK

JACQUELINE BURKHALTER,
THE BURKHALTER RANCH
CORPORATION, DRIVE
PROPERTIES, LLC, DRIVE
GULFPORT PROPERTIES LLC,
and TBR SUPPLY HOUSE, INC.,

JURY TRIAL DEMANDED

      Relief Defendants.

_____/

**NOTICE OF FILING COMPLAINT AND ORDER APPOINTING RECEIVER**

NOTICE IS HEREBY GIVEN that on August 13, 2024, Kenneth Dante Murena, Esq. was appointed as Receiver over Defendant Drive Planning, LLC, in the following enforcement action pending in the United States District Court for the Northern District of Georgia: *United States Securities Exchange Commission v. Drive Planning, LLC, et al.*, **Case No. 1:24-cv-03583-VMC** (the "Enforcement Action").

Pursuant to 28 U.S.C. Section 754, attached herewith is a copy of the Complaint along with a copy of the Order Appointing Receiver, in which the District Court, among other things, appointed Mr. Murena as Receiver.

Dated: August 16, 2024.

Respectfully submitted,

Damian Valori Culmo
*Counsel for the Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: 305-371-3960
Facsimile: 305-371-3965
rlandy@dvllp.com

/s/ Russell Landy
Russell Landy, Esq.
Florida Bar No. 44417

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 16, 2024 a true and correct copy of the foregoing has been served via e-mail upon:

/s/ Russell Landy
Russell Landy Esq.

Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 1 of 39

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### (ATLANTA DIVISION)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER, | |
| Defendants, | JURY TRIAL DEMANDED |
| and | |
| JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC., | |
| Relief Defendants. | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

### I.     OVERVIEW

1.     From 2020 through at least June 2024, Defendant Russell Todd Burkhalter ("Burkhalter") ran a Ponzi scheme through his business, Drive Planning, LLC ("Drive Planning"), selling unregistered securities in the form of "Real Estate Acceleration Loans" ("REAL"), which Burkhalter described in promotional materials as a "bridge loan opportunity promising 10% in 3 months."  As of the end of June 2024, over 2,000 investors had invested more than $300,000,000 in REAL.

2.     Defendants encouraged people to tap their savings, their IRAs, and even lines of credit, to invest in REAL.  As of early May 2024, the scheme was receiving applications for over a million dollars every day, driven by an organization of more than 100 sales agents.

3.     Defendants and the sales agents they trained falsely told REAL investors that Drive Planning pooled REAL investments and loaned that money out

to property developers and/or used it to enter into joint ventures with property developers, thereby earning the profits necessary to pay returns to REAL investors.

4.     In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months.  Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

5.     Emergency relief is necessary.  While Burkhalter pledged, on June 10, 2024, to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, he nevertheless paid sales commissions to Drive Planning sales agents on June 21, 2024.  Moreover, Burkhalter remains a signatory on bank accounts containing millions of dollars of investor funds and has recently entered into a divorce settlement pursuant to which he may transfer to his spouse property bought with investor funds.  There is a serious risk of dissipation of assets that could, if preserved, help fund investor redress.

6.     Given the scope and duration of this Ponzi scheme, an asset freeze and a receiver are necessary to gather, preserve and protect whatever assets still exist for the benefit of the victims of the Defendants' Ponzi scheme.

Case 2:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 4 of 39
121
Case 1:24-cv-03583-VMC   Document 1   Filed 08/13/24   Page 4 of 39

## II.  VIOLATIONS

7.      The Defendants have (1) employed devices, schemes, and artifices to defraud investors in the offer and sale of securities, (2) obtained money by means of material misrepresentations and omissions, and (3) engaged in acts practices and courses of business which operate as a fraud, all in violation of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

8.      The Defendants have (1) employed devices, schemes, and artifices to defraud investors in connection with the purchase and sale of securities, (2) made material misrepresentations and misleading omissions, and (3) engaged in acts, practices, and courses of business which operate as a fraud, all in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

9.      Defendant Burkhalter is also liable as a control person of Drive Planning under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for its violations of Exchange Act Section 10(b) and Rules 10b-5(a), (b), and (c).

## III.  JURISDICTION AND VENUE

10.      The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement plus prejudgment interest, for civil penalties, for an officer and director bar against Burkhalter, and for other equitable relief.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

12.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

13.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  In addition, Defendant Burkhalter resides (at least part-time) in this judicial district, Defendant Drive Planning maintains its principal place of business in this judicial district, and certain REAL investors reside in this judicial district.

14.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this

complaint, and in transactions, acts, practices, and courses of business of similar

purport and object.

## IV.  THE DEFENDANTS

15.    **Russell Todd Burkhalter**, age 52, is a resident of St. Petersburg,

Florida.  Burkhalter is the sole owner of Drive Planning which he alone controls

and which he operates from offices in Alpharetta, Georgia.  He formerly held a

Series 65 securities license and has been licensed in Georgia as a resident

insurance agent since 1997.

16.    **Drive Planning, LLC** is a Georgia limited liability company.

Burkhalter formed Drive Planning in 2015, listing himself as organizer and

registered agent, and listing offices in Johns Creek (Fulton County), Georgia.  At

all times relevant to this case, Burkhalter had actual control over Drive Planning's

assets and operations, and ultimate control over the use and disposition of investor

funds.  In short, Drive Planning is the alter ego of Burkhalter.  The most recent

annual registration lists offices at 8000 Avalon Boulevard in Alpharetta, Georgia.

## V.    RELIEF DEFENDANTS

17.    **Jacqueline Burkhalter** is a resident of Blue Ridge, Fannin County,

Georgia, in this judicial district.  She was Burkhalter's wife while Burkhalter

operated his Ponzi scheme.

18.     **The Burkhalter Ranch Corporation** ("Burkhalter Ranch") is a Georgia corporation incorporated on August 21, 2021.  Burkhalter Ranch has its principal office in Mineral Bluff, Georgia, in this judicial district.  Defendant Burkhalter is the Chief Executive Officer and Relief Defendant Jacqueline Burkhalter is listed as its Chief Financial Officer and Corporate Secretary.

19.     **Drive Properties, LLC** ("Drive Properties") is a Georgia limited liability company formed on January 8, 2019, with its principal place of business in Alpharetta, Georgia, in the same office as Defendant Drive Planning.  Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's Organizer.

20.     **TBR Supply House, Inc.** ("TBR") is a Georgia corporation formed on January 17, 2022, with its principal place of business in Mineral Bluff, Georgia.  Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's CEO, CFO, and Corporate Secretary.

21.     **Drive Gulfport Properties, LLC** ("Drive Gulfport") is a Florida limited liability company formed on December 9, 2019, with its principal place of business in St. Petersburg, Florida.  Relief Defendant Jacqueline Burkhalter is the registered agent for service of process and listed as the company's Manager.

## VI. FACTS

### The Ponzi Scheme Begins

22.     In 2020, Burkhalter began offering to the public what he described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

23.     Defendants produced and gave to potential investors promotional materials, including a large-font three-page color brochure (the "REAL brochure") that described REAL in four bullet points:

- 3-month term;

- 10% return;

- Quitclaim deed collateral; and

- $20,000 minimum.

24.     Investments in REAL were and are "securities," as defined by federal securities law.

25.     Defendants offered the REAL investments for sale nationwide and accepted investments from international investors.

26.     Defendants distributed the REAL brochure to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by

reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

27.     Another bulleted list on the REAL brochure represented:

- If you have $20,000 you can participate;

- You can use money from your retirement account;

- You don't have to be an accredited investor;

- You can use money from savings;

- You can use money from a line of credit; and

- You do not need to be a U.S. citizen.

28.     Burkhalter and the sales agents he recruited to sell REAL represented to prospective investors that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL investors.

29.     But the interest from property developers in doing business with Drive Planning proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days.

### *A Scheme to Defraud from Day One*

30.     Analysis of Drive Planning bank records indicates that the first investment in REAL occurred on September 22, 2020.

31.     On that date, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account at Truist Bank, which had a beginning balance of $90,665.  From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of $6.

32.     On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA.  Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments.  This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

33.     The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning.  The terms of that investment called for principal and fixed return to be paid in October 2020.

34.     The following chart shows the above-described flow of money:

| Drive Planning Truist Account xx2951 Summary of First Investment Use From September 22, 2020 to October 13, 2020 | | | | |
|---|---|---|---|---|
| First REAL Investment 9/22/20 | $ 50,000 | | | |
| Total Investor Deposits | 50,000 | Payment to Self-Directed IRA | $ | 112,000 |
| | | Less: Other Deposits | | (90,671) |
| Beginning Balance | 90,665 | REAL Investment Funds Used | $ | 21,329 |
| Other Deposits | 6 | | | |
| Total Other Deposits | $ 90,671 | | | |

35.     Likewise, Burkhalter used funds from the second and third investors in REAL for his personal benefit and not for bridge loans to property developers or joint ventures with property developers.

36.     The second investor in REAL wired $30,000 into the Drive Planning bank account at Truist on October 14, 2020.  The third investor wired in $150,000 on the same day.  At the time, the balance of the account was $11,689.  From October 14 to November 16, 2020, the account received $1,500 in additional deposits.

37.     On October 19, 2020, Burkhalter paid $40,000 to Atlantic RV Centers LLC.

38.     From October 14 to November 16, 2020, Burkhalter spent another $11,029 from the Drive Planning Truist bank account for additional RV-related expenses.

39.     Then, on November 16, 2020, Burkhalter sent a wire out of the Drive Planning Truist bank account for $42,518 to the law firm of Kessler & Solomiany, LLC.

40.     Kessler & Solomiany represented Burkhalter's ex-wife.

41.     The following chart shows the above-described flow of money from the second and third REAL investors and shows that Burkhalter used $80,358 from those investors for personal expenses, and not for bridge loans to property developers or joint ventures with property developers:

| | | | | |
|---|---|---|---|---|
| **Drive Planning Truist Account xx2951** | | | | |
| **From October 14, 2020 to November 16, 2020** | | | | |
| Second REAL Investment | $ | 30,000 | Atlantic RV Centers LLC | $ 40,000 |
| Third REAL Investment | | 150,000 | Other RV Expenses | 11,029 |
| Total Investor Deposits | | 180,000 | Kessler & Solomiany LLC | 42,518 |
| | | | Non-Real Estate Expenses | 93,547 |
| Beginning Balance | | 11,689 | Non-Real Estate Expenses | 93,547 |
| Other Deposits | | 1,500 | Less: Other Deposits | (13,189) |
| Total Other Deposits | $ | 13,189 | **REAL Investment Funds Used** | **$ 80,358** |

### *Expanding the Scheme with Sales Agents and Sales Incentives*

42.     Beyond the REAL brochure and other website content, Defendants increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

43.     Defendants paid sales agents a four percent commission on each REAL investment he or she sold, including on amounts that investors chose to "rollover" into a new 90-day investment.

44.     Defendants conducted frequent training seminars for Drive Planning sales agents but did not directly disclose to all agents that Drive Planning did not have a profit generating enterprise sufficient to meet obligations to REAL investors and sales agents.

45.     Defendants further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council.  Entry into the clubs required selling a certain amount of Drive Planning products, including REAL.

46.     Sales of $2,500,000 entitled the sales agent to membership in the President's Club.

47.     Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council.

48.     Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

49.     Defendants' sales plan worked.  Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Defendants raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

50.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments.  Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

51.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors.  Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024.  The available bank records approximately match these values, showing Defendants raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024.

52.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor.

53.     While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents.

54.     Because Drive Planning received only $17.6 million from sources

other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds.

55.     For one recent two-week period, Drive Planning paid sales commissions of $1.92 million.

### *Preserving Capital for the Scheme Through Rollovers*

56.     Drive Planning furthered the scam by prompting investors to rollover their REAL investments, including the supposed 10 percent return, at the end of the three-month term.

57.     Drive Planning did so by sending an email to investors at about day 60 of the 90-day term, asking whether investors wanted to make a withdrawal, rollover the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

58.     In connection with solicitation of an election to withdraw or roll over the investment, Drive Planning never disclosed that any withdrawal would necessarily be sourced by, not a profit, but the principal invested by a later REAL investor, nor that any interest credited was a phantom number and not the product of profitable use of the investors' funds.

59.    Drive Planning received $8.8 million in REAL investments in 2021, $63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through early May 2024).

### *No Viable Engine for Generating the Supposed 10 Percent Return*

60.    Bank records reveal that, contrary to what it represented to investors and prospective investors, Drive Planning was not deploying the cash from REAL investments into bridge loans to developers or joint ventures with developers.

61.    Unbeknownst to investors, Drive Planning did not receive substantial income from loans to or joint ventures with property developers.  Rather, Drive Planning's revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $5,000) from clients who received financial planning services, and rental income from a few properties.

62.    From September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million.  Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program.  During this same period, Drive Planning only received funds totaling $17.6 million from other sources, with $4 million of that from other investment programs Drive Planning was running.

### *Ponzi Payments*

63.    Based on the bank records, from September 1, 2020, to June 2024,

investors received "returns" of $154.9 million.  With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least approximately $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

| Summary | | | | |
|---|---|---|---|---|
| **Deposits** | | | **Ponzi Analysis** | |
| Total Deposits | $ 389,665,393 | | Non-Investor Deposits | $ 17,642,625 |
| Less: Investor Deposits | (372,022,769) | | Less: Investor Repayments | (154,918,462) |
| Non-Investor Deposits | $ 17,642,625 | | (Investor-Funded Repayments) | $ (137,275,837) |

64.    Without new investor funds, Drive Planning would not have been able to meet its repayment obligations.  For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors.

65.    In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

66.    Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors.  Based on its purported collateral and historical cash flows, it does not appear that Drive Planning will be able to generate future revenue sufficient to pay its investors.

### *Spending Other People's Money*

67.    In addition to misusing investor money for Ponzi payments, Burkhalter misappropriated millions of dollars of investor funds to acquire and

maintain a wealthy lifestyle.   Some examples of Burkhalter's misappropriation follow.

68.     On October 20, 2023, Drive Planning transferred $3.1 million from Drive Planning's JPMorgan account to MarineMax for the purchase of a yacht called "Stillwater".  At least $2 million of this payment came from investor funds.

69.     Purchase documents received from MarineMax show that Burkhalter purchased the yacht for himself.

70.     The MarineMax documents state that the yacht will be titled under Burkhalter's name and that, while Drive Planning would provide the payment, it "will hold no claim or interest" in the yacht, now renamed "Live More."

71.     Below is a listing photo for the yacht taken prior to Burkhalter's purchase.



72.     From September 2020 to June 2024, Drive Planning and Burkhalter spent additional large sums of investor funds on expenses that are not consistent with the real estate deals represented to investors in the REAL program.

73.     Because the funds to make these purchases came from Drive Planning accounts that primarily held investor funds, Defendants must have used investor funds to make these purchases.

74.     For example, Drive Planning and Burkhalter spent $319,628 on clothing, jewelry, and beauty treatments.  They spent $69,293 at Diamonds Direct, $75,785 at Louis Vuitton, and $7,777 at Drip IV, a beauty and wellness company located in St. Petersburg, Florida.

Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 20 of 39
121
Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 20 of 39

75.     Defendants also spent considerable funds on luxury travel and vacations, including least $4.6 million on chartering private jets and luxury car services, at least $183,871 on hotels and resorts (including $15,404 to Norwegian Cruise Line, $12,750 to Access Italy, an Italian travel company, and $8,738 to Expedia.com).

76.     Drive Planning and Burkhalter used $1.3 million to repay investors in Drive Planning's other investment programs.

77.     Defendants spent at least $749,243 on automobile related expenses, including at least $92,127 to a Jaguar Land Rover dealer, $243,414 to Crown Automotive in St. Petersburg, Florida, and another $67,006 to Carvana.

78.     From May 24, 2021, through December 2023, Drive Planning transferred $1.9 million to Coinbase.  Starting in April 2023, Drive Planning received $1.2 million back from Coinbase, for a net of $732,966 transferred to Coinbase.  Burkhalter also used investor funds to buy a ranch in Mineral Bluff (Fannin County), Georgia.

79.     On this property, Burkhalter used investor funds to build a large barn (the "Staurolite Barn") in Mineral Bluff, Georgia, which he rents out as an event venue.

80.     Burkhalter used investor funds to buy a clothing business in Blue Ridge, Georgia.  Relief Defendant TBR Supply House operates that business.

81.    Burkhalter used at least $2 million in investor funds to buy a luxury condo in Cabo San Lucas, Mexico.

82.    In March 2024, Burkhalter wired $1,145,000 of investor funds to NetJets, a private jet company.

83.    On information and belief, Burkhalter used or intends to use real estate purchased with investor funds to fund his obligations under a divorce settlement.

## Defendants' Misrepresentations and Omissions

84.    In addition to the above-described scheme to defraud, Defendants further defrauded investors through material misrepresentations and omissions made in connection with sales of REAL.

### Investor A

85.    For example, in 2022, Burkhalter and Drive Planning's Chief Operating Officer ("the COO"), spoke by phone to an investor in South Carolina ("Investor A"), soliciting him to invest in REAL.  During that call, Burkhalter and the COO represented that REAL would produce a guaranteed return of 10 percent for a three-month investment and that the investor's funds would be used to make bridge loans to property developers or to enter profitable joint ventures with property developers.

86.     In their conversations with Investor A, Burkhalter and the COO referred him to a list of properties that they claimed were owned by Drive Planning and would be collateral for his investment.

87.     Neither Burkhalter nor the COO disclosed that Investor A's investment would or could be used to make principal or interest payments to other investors.

88.     Neither Burkhalter nor the COO told Investor A that his money would or could be used to fund personal purchases by Drive Planning's principals.

89.     In reliance on the above representations and in ignorance of the above omissions, Investor A invested $45,000 in REAL in 2022.  Encouraged by what he thought were profits on that first investment, he invested another $100,000 in REAL in 2024.

***Investor B***

90.     In 2021, an investor in Georgia ("Investor B") became a client of Drive Planning, purchasing life insurance and receiving financial advice.

91.     In a phone call in July 2021, Burkhalter solicited Investor B to invest in REAL, telling him that REAL was a profit-sharing deal in which Drive Planning would provide capital to a property developer, and that profits would be split with REAL investors and used to pay the returns on the REAL investment.  Burkhalter

22

guaranteed returns of 10 percent for a three-month investment and told Investor B that there was an option to rollover the investment up to three times.

92.     No one from Drive Planning told Investor B that his investment could or would be used to make principal or interest payments to other investors, to fund the personal expenses of Burkhalter, or that certain properties bought by Drive Planning with investor money were not owned by Drive Planning.

93.     In reliance on the above representations and in ignorance of the above omissions, Investor B invested $100,000 in REAL in July 2021 and rolled over the investment twice before withdrawing $133,000 in what he believed was principal and interest in April 2022.

94.     Reassured by what they believe to be "returns," Investor B and his spouse invested in REAL several more times, including on November 18, 2022 ($20,000), on April 12, 2023 ($50,000), on April 14, 2023 ($100,000), on June 21, 2023 ($280,000), on June 26, 2023 ($25,000), on January 4, 2024 ($20,000), and on January 15, 2024 ($30,000).  Some of the proceeds for the above additional investments came from Investor B's Roth IRA account and his children's 529 accounts.

### Company A

95.     On or about March 28, 2023, Burkhalter and the COO visited the New Jersey offices of a financial and insurance consulting firm ("Company A").

23

96.    During that visit, Burkhalter and the COO promoted the REAL program, telling the principal of Company A that REAL was designed to provide bridge loans for highly profitable real estate development deals.

97.    Burkhalter and the COO represented that REAL participants would receive a ten percent rate of return every three months, and there was a choice to roll over the investment plus interest or withdraw it at the end of each three-month term.

98.    Burkhalter and the COO also said that REAL investments were protected by Drive Planning's ownership of real property pledged as collateral.

99.    Burkhalter and the COO did not disclose that REAL investments would or could be used to pay back principal or interest to earlier investors, nor that any supposed "return" could be funded by principal invested by later investors, rather than by profits from real estate deals, nor that REAL investments would or could be used to fund the personal expenses of Burkhalter and/or the COO.

100.    In reliance on the above representations and ignorance of the above omissions, Company A invested $25,000 in REAL on or about February 16, 2021.

101.    Company A rolled over the funds for five quarters before withdrawing $48,717.92.

102. Reassured by the "return" received as promised, Company A began referring certain clients to Drive Planning for investment in REAL in exchange for commission payments to Company A of four percent for each new REAL investor.

103. On June 4, 2024, Company A received notice from Drive Planning via email that it was halting new investments in REAL as of June 15.

104. On June 5, 2024, the principal of Company A spoke to Burkhalter by phone and asked whether there was a potential regulatory issue with Drive Planning.

105. Although he knew at the time that the SEC was investigating Drive Planning, Burkhalter responded that there was no regulatory issue, and that the halt in the REAL program was due to an internal audit.

### Other Prospective REAL Investors

106. As they had in the above-cited specific instances, Defendants told other prospective REAL investors that Drive Planning generated the return for REAL investors through its business ventures with property developers.

107. In fact, unbeknownst to investors, Defendants did not have a profit-generating enterprise sufficient to meet its obligations to REAL investors.

108. As they had in the above-cited specific instances, Defendants told prospective investors in REAL that their investments were collateralized by real estate.

109.    In fact, REAL investors held no security interest in any real estate.
Their investments were wholly unsecured.

110.    As they did in the above-cited specific examples, Defendants omitted
to disclose to other prospective REAL investors that Drive Planning's revenue
from other sources could not possibly meet obligations to REAL investors.

111.    As they did in the above-cited specific examples, Defendants omitted
to disclose to other REAL investors that the payments they received at the end of
the 90-day term of their investment were funded by principal invested by other
REAL investors.

112.    As referenced above, Burkhalter represented to investors and
prospective investors that Drive Planning had purchased real estate that
collateralized its obligations to REAL investors.

113.    Defendants created and distributed a brochure entitled "The Drive
Planning Portfolio of Real Estate Investments" ("Drive Planning Real Estate
Brochure").

114.    On that brochure, Defendants represented that, "The REAL
Opportunity not only has partners that we work with to offer bridge loans and
profit sharing in their real estate deals, but also has the full support of the assets of
Drive Planning's own Portfolio of REAL Estate Investments."

115.   That representation was false and misleading in at least two respects.

116.   First, Defendants' "bridge loans and profit sharing" deals with supposed "partners" were extremely limited.  Defendants used a miniscule share of the REAL funds for bridge loans and profit-sharing deals with partners.

117.   The Drive Planning Real Estate Brochure was also false and misleading in referring to Drive Planning's supposed "Portfolio of REAL Estate Investments."  The brochure lists 23 properties, but only a few of them are titled in the name of Drive Planning, while others are titled to Burkhalter individually.  Moreover, there is no documentation showing how any of these properties secured Drive Planning's obligations to REAL investors.

118.   Defendants misled investors by omitting to disclose Burkhalter's use of investor funds to fund his purchases of luxury goods and services.

119.   Defendants further misled investors by omitting to disclose their use of investor funds to pay commissions to Drive Planning sales agents.

120.   Defendants further misled investors by omitting to disclose their use of investor funds for other Drive Planning business expenses.

121.   Defendants further misled investors and prolonged the scheme by producing videos in which Burkhalter touted the supposed bank balances and properties that, he said, proved Drive Planning's legitimacy, when he knew that the REAL program had been a Ponzi scheme from its inception.

## Relief Defendants Received Proceeds of the Ponzi Scheme

### *Jacqueline Burkhalter*

122.   Relief Defendant Jacqueline Burkhalter was married to Burkhalter while Burkhalter operated his Ponzi scheme.

123.   Burkhalter used at least $6,603,088 in Drive Planning funds to purchase real estate titled in the names of Todd and Jacqueline Burkhalter.

124.   On June 1, 2023, Jacqueline Burkhalter filed a divorce action against Burkhalter in the Superior Court of Fannin County, Georgia.

125.   In her complaint, Jacqueline Burkhalter pled for a forensic accounting of Drive Planning so that the assets of Drive Planning could be considered in the equitable distribution of marital property.

126.   On June 3, 2024, the parties reported to the Superior Court that they had reached a settlement.

127.   In addition to the real estate, Jacqueline Burkhalter received at least $1,232,300 in additional cash transfers from Drive Planning, and another $2,122,018 in transfers from Relief Defendant The Burkhalter Ranch.

128.   Jacqueline Burkhalter does not have a legitimate claim to the above-described assets because she provided nothing of value in return for them.

### *Burkhalter Ranch Corporation*

129.   Relief Defendant Burkhalter Ranch Corporation received ill-gotten funds from the above-described Ponzi scheme.  Drive Planning paid at least $5.8 million to purchase properties in the Burkhalter Ranch Corporation's name.  From September 2020 through June 2024, Burkhalter Ranch received an additional $17.1 million in cash transfers from Drive Planning.

130.   Because it provided nothing of value in return for these transfers, Burkhalter Ranch does not have a legitimate claim to those assets.

### *Drive Properties*

131.   Relief Defendant Drive Properties received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $777,000 for properties, much of which came from investor funds, and titled those properties in Drive Properties' name.

132.   Because it provided nothing of value in return for these properties, Drive Properties does not have a legitimate claim to those assets.

### *Drive Gulfport*

133.   Relief Defendant Drive Gulfport received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $944,118

for property, much of which came from investor funds, and titled that property in Drive Gulfport's name.

134.   Because it provided nothing of value in return for that property, Drive Gulfport does not have a legitimate claim to that asset.

### *TBR*

135.   Relief Defendant TBR received ill-gotten funds from the above-described Ponzi scheme.  Specifically, TBR received $352,000 in cash transfers from Relief Defendant Burkhalter Ranch.  In addition, Drive Planning paid at least $900,000 for property, much of which came from investor funds, and titled that property in TBR's name.  Additionally, Drive Planning transferred at least an additional $12,307 in cash to TBR.

136.   Because it provided nothing of value in return for the property and cash transfers, TBR does not have a legitimate claim to those assets.

137.   In equity, Relief Defendants should disgorge the ill-gotten funds that they received, for the benefit of victims of the Ponzi scheme.

Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 31 of 39
121
Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 31 of 39

### Current State of the Scheme

138.   On June 10, 2024, Defendants represented to the SEC that they would accept no new investments in REAL, would not pay amounts due to REAL investors, and would not pay commissions to sales agents.

139.   Despite that pledge, Defendants paid sales commission on June 21, 2024.

140.   On information and belief, on July 23, 2024, Burkhalter sent an email to Drive Planning sales agents, advising that the SEC was "reviewing" the REAL investment program, and falsely suggesting that Drive Planning could get investors "their payments in a timely manner" but for the SEC's "review."

141.   In truth, as Burkhalter is aware, any such continued payments would necessarily constitute a continuation of the Ponzi scheme, with Burkhalter continuing to misrepresent payments to investors as coming from profits, rather than from money invested by others.

142.   Burkhalter still has control over the tens of millions of dollars currently in Drive Planning's bank accounts, as well as over the tens of millions of dollars' worth of real estate and other property purchased with investor funds.

Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 32 of 39
121
Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 32 of 39

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

143.   Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

144.   Beginning in or around 2020 and continuing through the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

145.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud.

146.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 33 of 39
121
Case 1:24-cv-03583-VMC Document 1 Filed 08/13/24 Page 33 of 39

### COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

147.  Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

148.  Beginning in or around 2020 and continuing through the present, Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

        a.      obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        b.      engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

149.  By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

Case 1:24-cv-03583-VMC   Document 1   Filed 08/13/24   Page 34 of 39
121
Case 1:24-cv-03583-VMC   Document 1   Filed 08/13/24   Page 34 of 39

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act and
Sections (a), (b), and (c) of Rule 10b-5 thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]**

150.    Paragraphs 1 through 142 are hereby re-alleged and are incorporated herein by reference.

151.    Between in or around 2020 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud;

    b.    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

152.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

153.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV – CONTROL PERSON LIABILITY (FRAUD)

### Violations of Section 20(a) of the Exchange Act
### [15 U.S.C. § 78t(a)]
### (Against Burkhalter)

154.    Paragraphs 1 through 153 are realleged and incorporated by reference herein.

155.    At all times relevant hereto, Defendant Burkhalter controlled Drive Planning for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

156.    By engaging in the conduct alleged above, Defendant Burkhalter is liable as a control person for Drive Planning's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT V – DISGORGEMENT
### (Against Relief Defendants)

157.    Paragraphs 1 through 156 are realleged and incorporated by reference herein.

158.    As alleged above, Defendants violated the federal securities laws by engaging in fraudulent activity and misappropriating substantial investor assets.

159.   Defendants, directly or indirectly, transferred funds to Relief

Defendants, including by sending funds to Relief Defendants and paying for property

in the name of Relief Defendants.  Relief Defendants do not have a legitimate claim

to the assets Defendants transferred to them.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

## I.

A temporary restraining order and preliminary and permanent injunctions

enjoining the Defendants, their officers, agents, servants, employees, and attorneys

from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections

17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1),

(a)(2), (a)(3)].

## II.

An order barring Burkhalter from acting as an officer or director of any

issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to

Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)][15 U.S.C. § 77t(e) and 15

U.S.C. § 78u(d)(2)].

**III.**

An order requiring an accounting by Defendants of the amounts raised and the use of proceeds from the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order requiring an accounting by each Relief Defendant of the amounts received from Defendants and an order that they disgorge such amounts plus prejudgment interest.

**V.**

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

**VI.**

An order freezing the assets of Defendants pending further order of the Court.

**VII.**

An order freezing real estate assets of Relief Defendants and any assets derived, directly or indirectly, from amounts received from Drive Planning.

Case 1:24-cv-03583-VMC   Document 1   Filed 08/13/24   Page 38 of 39
121
Case 1:24-cv-03583-VMC   Document 1   Filed 08/13/24   Page 38 of 39

## VIII.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

## IX.

An order expediting discovery.

## X.

The appointment of a Receiver to take charge of Drive Planning and its affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

## XI.

An order requiring Burkhalter to surrender all passport(s) issued to him to the Clerk of Court and barring him from applying for or accepting any additional passports and barring him from traveling outside the United States pending resolution of this case on the merits.

## XII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may

be so tried.

This 13th day of August, 2024.

Respectfully submitted,

/s/*Pat Huddleston II*
Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984
huddlestonp@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Harry B. Roback
Senior Trial Counsel
Georgia Bar No. 706790
robackh@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7616
Facsimile: *4048427679@fax.sec.gov*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**(ATLANTA DIVISION)**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DRIVE PLANNING, LLC and RUSSELL TODD BURKHALTER,**<br><br>**Defendants,**<br><br>**and**<br><br>**JACQUELINE BURKHALTER, THE BURKHALTER RANCH, DRIVE PROPERTIES, LLC, TBR SUPPLY HOUSE, INC., and DRIVE GULFPORT PROPERTIES,**<br><br>**Relief Defendants.** | Civil Action No.  1:24-cv-03583-VMC |

## <u>ORDER APPOINTING RECEIVER</u>

**WHEREAS** this matter has come before this Court upon Plaintiff Securities and Exchange Commission's unopposed motion to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of Defendant Drive Planning,

LLC ("Receivership Assets") and the assets of Defendant Burkhalter and the Relief

Defendants that: (a) are attributable to funds derived from investors or clients of the

Defendants; (b) are held in constructive trust for the Defendants; and/or (c) may

otherwise be includable as assets of the estates of the Defendants (collectively, the

"Recoverable Assets"); and,

**WHEREAS** this Court has subject matter jurisdiction over this action and

personal jurisdiction over the Defendants and Relief Defendants, and venue

properly lies in this district.

## NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      This Court hereby takes exclusive jurisdiction and possession of the

assets, of whatever kind and wherever situated, of the following Defendant:

Drive Planning, LLC (the "Receivership Defendant").

2.      Until further Order of this Court, Kenneth Murena, Esq. is hereby

appointed to serve without bond as receiver (the "Receiver") for the estate of the

Receivership Defendant.

3.      Except as otherwise specified herein, all Receivership Assets and

Recoverable Assets are frozen until further order of this Court.  Accordingly, all

persons and entities with direct or indirect control over any Receivership Assets

and/or any Recoverable Assets, other than the Receiver, are hereby restrained and

enjoined from directly or indirectly transferring, setting off, receiving, changing,

selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing

such assets. This freeze shall include, but not be limited to, Receivership Assets

and/or Recoverable Assets that are on deposit with financial institutions such as

banks, brokerage firms and mutual funds.

## II. General Powers and Duties of Receiver

4.      The Receiver shall have all powers, authorities, rights and privileges

heretofore possessed by the officers, directors, managers and general and limited

partners of the Receivership Defendant under applicable state and federal law, by

the governing charters, by-laws, articles and/or agreements in addition to all

powers and authority of a receiver at equity, and all powers conferred upon a

receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule

of Civil Procedure 66.

5.      The trustees, directors, officers, managers, employees, investment

advisors, accountants, attorneys and other agents of the Receivership Defendant

are hereby dismissed and the powers of any general partners, directors and/or

managers are hereby suspended. Such persons and entities shall have no authority

with respect to the Receivership Defendant's operations or assets, except to the

extent as may hereafter be expressly granted by the Receiver. The Receiver shall

assume and control the operation of the Receivership Defendant and shall pursue

and preserve all of their claims.

6.      No person holding or claiming any position of any sort with any of the Receivership Defendant shall possess any authority to act by or on behalf of any of the Receivership Defendant.

7.      Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

A.      To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendant, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendant owns, possesses, has a beneficial interest in, or controls directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estate");

B.      To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendant; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C.      To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D.      To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.      To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers,

trustees and agents of the Receivership Defendant;

F.    To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.    The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.    To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

K.    To take such other action as may be approved by this Court.

### III.  Access to Information

8.    The Receivership Defendant and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, accountants and employees of the Receivership Defendant, as well as those acting in their place, are hereby ordered and directed to preserve and turn over or provide access to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendant and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other

instruments and papers.

9.     Within ten (10) days of the entry of this Order, the Receivership
Defendant shall file with the Court and serve upon the Receiver and the
Commission a sworn statement, listing: (a) the identity, location and estimated
value of all Receivership Property; (b) all employees (and job titles thereof), other
personnel, attorneys, accountants and any other agents or contractors of the
Receivership Defendant; and, (c) the names, addresses and amounts of claims of
all known creditors of the Receivership Defendant, except to the extent this
information was previously provided to the Commission.

10.     Within ninety (90) days of the entry of this Order, or at a date set
by the Court, the Receiver shall file with the Court and serve upon the parties a
sworn statement and accounting, with complete documentation, covering the
period from January 1, 2019 to the present:

        A.     Of all Receivership Property, wherever located, held by or in
               the name of the Receivership Defendant, or in which it,
               directly or indirectly, has or had any beneficial interest, or
               over which it maintained or maintains and/or exercised or
               exercises control, including, but not limited to: (a) all
               securities, investments, funds, real estate, automobiles, jewelry
               and other assets, stating the location of each; and (b) any and
               all accounts, including all funds held in such accounts, with
               any bank, brokerage or other financial institution held by,

in the name of, or for the benefit of any of them, directly or indirectly, or over which it maintained or maintains and/or exercised or exercises any direct or indirect control, or in which it had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

B.    Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendant has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendant;

C.    Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by the Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.    Of all assets received by the Receivership Defendant from any person or entity, including the value, location, and disposition of any assets so received;

E.    Of all funds received by the Receivership Defendant, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G.    Of all expenditures exceeding $1,000 made by the Receivership Defendant, including those made on their behalf by any person or entity; and

H.    Of all transfers of assets made by the Receivership Defendant.

11.    Within thirty (30) days of the entry of this Order, the Receivership

Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 8 of 25
121
Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 8 of 25

Defendant shall provide to the Receiver and the Commission copies of the Receivership Defendant's federal income tax returns for 2015-2023 with all relevant and necessary underlying documentation.

12.    The Receivership Defendant and the Receivership Defendant's past and/or present officers, directors, agents, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendant, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendant.  In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.  Nothing in this paragraph, however, shall preclude a witness, including Defendant Burkhalter, from asserting his or her Fifth Amendment right against self-incrimination or from claiming any other legal privilege against providing such information.

13.    The Receiver shall have the authority to issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and applicable Local Rules, except for the provisions of Federal Rule of Civil Procedure 26(d)(1), concerning any subject matter within

Case 1:24-cv-03583-VMC   Document 10   Filed 08/13/24   Page 9 of 25
121
Case 1:24-cv-03583-VMC   Document 10   Filed 08/13/24   Page 9 of 25

the powers and duties granted by this Order.

14.     The Receivership Defendant is required to assist the Receiver in fulfilling his duties and obligations.  As such, it must respond promptly and truthfully to all requests for information and documents from the Receiver.  Nothing in this paragraph, however, shall preclude a witness, including Defendant Burkhalter, from asserting his or her Fifth Amendment right against self-incrimination or from claiming any other legal privilege against providing such information.

## IV. Access to Books, Records and Accounts

15.     The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Defendant.  All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

16.     The Receivership Defendant, as well as its agents, servants, employees, any persons acting for or on behalf of the Receivership Defendant, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendant are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17.     All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by,

in the name of, or for the benefit of, directly or indirectly, and of the Receivership

Defendant that receive actual notice of this Order by personal service, facsimile

transmission or otherwise shall:

A. Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendant except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver, counsel for the Commission, and Defendants a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. **Access to Real and Personal Property**

18. The Receiver is authorized to take immediate possession of all

personal property of the Receivership Defendant, wherever located, including but

not limited to electronically stored information, computers, laptops, hard drives,

external storage drives, and any other such memory, media or electronic storage

devices, books, papers, data processing records, evidence of indebtedness, bank

records and accounts, savings records and accounts, brokerage records and

accounts, certificates of deposit, stocks, bonds, debentures, and other securities and

Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 11 of 25
121
Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 11 of 25

investments, contracts, mortgages, furniture, office supplies and equipment.

19     The Receiver is authorized to take immediate possession of all real property of the Receivership Defendant, wherever located, including but not limited to all ownership and leasehold interests and fixtures.  Upon receiving actual notice of this Order by personal service, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing or erasing anything on such premises.

20.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above.  The Receiver shall have exclusive control of the keys.  The Receivership Defendant, or any other person acting or purporting to act on its behalf, is ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

21.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendant, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties

Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 12 of 25
121
Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 12 of 25

to take possession, custody and control of, or identify the location of, any assets,

records or other materials belonging to the Receivership Estate.

## VI. **Notice to Third Parties**

23.     The Receiver shall promptly give notice of his or her appointment to

all known officers, directors, agents, employees, shareholders, creditors, debtors,

managers and general and limited partners of the Receivership Defendant, as the

Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with

respect to an ownership interest to any Receivership Defendant shall, until further

ordered by this Court, pay all such obligations in accordance with the terms thereof

to the Receiver and its receipt for such payments shall have the same force and effect

as if the Receivership Defendant had received such payment.

25.     In furtherance of his or her responsibilities in this matter, the Receiver

is authorized to communicate with, and/or serve this Order upon, any person,

entity or government office that he deems appropriate to inform them of the status

of this matter and/or the financial condition of the Receivership Estate.  All

government offices which maintain public files of security interests in real and

personal property shall, consistent with such office's applicable procedures, record

this Order upon the request of the Receiver or the SEC.

26.     The Receiver is authorized to instruct the United States Postmaster to

hold and/or reroute mail which is related, directly or indirectly, to the business,

operations or activities of the Receivership Defendant (the "Receiver's Mail"),
including all mail addressed to, or for the benefit of, the Receivership Defendant.
The Postmaster shall not comply with, and shall immediately report to the Receiver,
any change of address or other instruction given by anyone other than the Receiver
concerning the Receiver's Mail. The Receivership Defendant shall not open any of
the Receiver's Mail and shall immediately turn over such mail, regardless of when
received, to the Receiver. All personal mail of any individual Defendant, and/or any
mail appearing to contain privileged information belonging to any of the
Receivership Defendant's officers, directors, agents, managers, shareholders,
employees, managers and general and limited partners, and/or any mail not falling
within the mandate of the Receiver, shall be released to the named addressee by the
Receiver. The foregoing instructions shall apply to any proprietor, whether
individual or entity, of any private mail box, depository, business or service, or mail
courier or delivery service, hired, rented or used by the Receivership Defendant. The
Receivership Defendant shall not open a new mailbox, or take any steps or make any
arrangements to receive mail in contravention of this Order, whether through the
U.S. mail, a private mail depository or courier service.

27.     Subject to payment for services provided, any entity furnishing water,
electric, telephone, sewage, garbage or trash removal services to the Receivership
Defendant shall maintain such service and transfer any such accounts to the Receiver
unless instructed to the contrary by the Receiver.

28.     The Receiver is authorized to assert, prosecute and/or negotiate any

claim under any insurance policy held by or issued on behalf of the Receivership

Defendant, or its officers, directors, agents, employees or trustees, and to take any

and all appropriate steps in connection with such policies.

## VII.  Injunction Against Interference with Receiver

29.     The Receivership Defendant and all persons receiving notice of this

Order by personal service, facsimile or otherwise, are hereby restrained and enjoined

from directly or indirectly taking any action or causing any action to be taken,

without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control,
       possession, or management of any Receivership Property;
       such prohibited actions include but are not limited to, using
       self-help or executing or issuing or causing the execution or
       issuance of any court attachment, subpoena, replevin,
       execution, or other process for the purpose of impounding
       or taking possession of or interfering with or creating or
       enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct or otherwise interfere with the Receiver in
       the performance of his duties; such prohibited actions
       include but are not limited to, concealing, destroying or
       altering records or information;

C.     Dissipate or otherwise diminish the value of any
       Receivership Property; such prohibited actions include but
       are not limited to, releasing claims or disposing,
       transferring, exchanging, assigning or in any way
       conveying any Receivership Property, enforcing
       judgments, assessments or claims against any Receivership
       Property or any Receivership Defendant, attempting to
       modify, cancel, terminate, call, extinguish, revoke or
       accelerate (the due date), of any lease, loan, mortgage,
       indebtedness, security agreement or other agreement

executed by any Receivership Defendant or which
otherwise affects any Receivership Property; or,

D.   Interfere with or harass the Receiver, or interfere in any
manner with the exclusive jurisdiction of this Court over
the Receivership Estates.

30.     The Receivership Defendant shall cooperate with and assist the

Receiver in the performance of his duties.

31.     The Receiver shall promptly notify the Court and SEC counsel of any

failure or apparent failure of any person or entity to comply in any way with the

terms of this Order.

## VIII.  Stay of Litigation

32.     As set forth in detail below, the following proceedings, excluding the

instant proceeding and all police or regulatory actions and actions of the Commission

related to the above-captioned enforcement action, are stayed until further Order of

this Court:

All civil legal proceedings of any nature, including, but not limited to,
bankruptcy proceedings, arbitration proceedings, foreclosure actions, default
proceedings, or other actions of any nature involving: (a) the Receiver, in his
capacity as Receiver; (b) any Receivership Property, wherever located; (c)
the Receivership Defendant, including subsidiaries and partnerships; or, (d)
the Receivership Defendant's past or present officers, directors, managers,
agents, or general or limited partners sued for, or in connection with, any
action taken by them while acting in such capacity of any nature, whether as
plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise
(such proceedings are hereinafter referred to as "Ancillary Proceedings").

33.     The parties to any and all Ancillary Proceedings are enjoined from

commencing or continuing any such legal proceeding, or from taking any action, in

connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.     Further, as to a cause of action accrued or accruing in favor of the Receivership Defendant against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.  Managing Assets

35.     For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

36.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Drive Planning, LLC," together with the name of the action.

37.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

38.     Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the

sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

39.     Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estate.

40.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

41.     The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable, whether proposed, temporary or final, or pronouncements thereunder, including the filing of the elections and statements contemplated by those provisions. The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements

imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a

taxpayer identification number, (b) timely filing applicable federal, state, and local

tax returns and paying taxes reported thereon, and (c) satisfying any information,

reporting or withholding requirements imposed on distributions from the Settlement

Fund. The Receiver shall cause the Settlement Fund to pay taxes in a manner

consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."

The Receivership Defendant shall cooperate with the Receiver in fulfilling the

Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## X.  Investigate and Prosecute Claims

42.     Subject to the requirement, in Section VII above, that leave of this

Court is required to resume or commence certain litigation, the Receiver is

authorized, empowered and directed to investigate, prosecute, defend, intervene in or

otherwise participate in, compromise, and/or adjust actions in any state, federal or

foreign court or proceeding of any kind as may in his discretion, and in consultation

with SEC counsel, be advisable or proper to recover and/or conserve Receivership

Property.

43.     Subject to his or her obligation to expend receivership funds in a

reasonable and cost-effective manner, the Receiver is authorized, empowered and

directed to investigate the manner in which the financial and business affairs of

the Receivership Defendant were conducted and (after obtaining leave of this

Court) to institute such actions and legal proceedings, for the benefit and on behalf

of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver may file a motion with the Court to waive all privileges, including the attorney-client privilege, held by the Receivership Defendant.  The Receiver must confer with counsel for Defendant Burkhalter before filing any such motion and explain the reason(s) for seeking the waiver.  If the Receiver and Defendant Burkhalter are unable to reach an agreement, the Receiver may file his or her motion and Defendant Burkhalter shall have the opportunity to respond to any such motion.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his or her Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI. **Bankruptcy Filing**

46.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendant. If a Receivership Defendant is placed in bankruptcy

proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity, except that the Receiver shall not be empowered to waive all privileges, including the attorney client privilege, unless granted permission to do so by the Court. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendant and may therefore file and manage a Chapter 11 petition.

47. The provisions of Section VIII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendant in bankruptcy proceedings.

## XII. <u>Liability of Receiver</u>

48. Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

49. The Receiver and his/her agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel nor shall the Receiver

Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 21 of 25
121
Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 21 of 25

or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

50.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

51.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a  successor.  The Receiver shall then follow such instructions as the Court may provide.

### XIII.  Recommendations and Reports

52.     The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

53.     Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

54.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file with the Court and serve on the parties a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the

Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 22 of 25
121
Case 1:24-cv-03583-VMC Document 10 Filed 08/13/24 Page 22 of 25

existence, value, and location of all Receivership Property, and of the extent of

liabilities, both those claimed to exist by others and those the Receiver believes to

be legal obligations of the Receivership Estates.

    55.    The Quarterly Status Report shall contain the following:

    A.    A summary of the operations of the Receiver;

    B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

    C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

    D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

    E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

    F.    A list of all known creditors with their addresses and the amounts of their claims;

    G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

    H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

56.     On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

### XIV. <u>Fees, Expenses and Accountings</u>

57.     Subject to Paragraphs 58– 64 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

58.     Subject to Paragraph 59 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

59.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

60.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

61.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

62.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

63.     Each Quarterly Fee Application shall:

A.      Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B.      Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of

the Receivership Estate; and, (ii) with the exception of the
Billing Instructions, the Receiver has not entered into any
agreement, written or oral, express or implied, with any person
or entity concerning the amount of compensation paid or to be
paid from the Receivership Estate, or any sharing thereof.

64.    At the close of the Receivership, the Receiver shall submit a Final

Accounting, in a format to be provided by SEC staff, as well as the Receiver's final

application for compensation and expense reimbursement.

**IT IS SO ORDERED, this** 13th **day of** August , 2024, at Atlanta,

**Georgia.**

                                      **VICTORIA MARIE CALVERT**
                                        **UNITED STATES DISTRICT JUDGE**



August 16, 2024

<u>Via FedEx</u>

Attn: Clerk of the Court
U.S. District Court
Clerk's Office, Room 105
46 East Ohio Street
Indianapolis, IN 46204

   Re:   *United States Securities and Exchange Commission v. Drive Planning, LLC, et al.*
       Case No. 1:24-cv-03583-VMC

Dear Clerk:

     Enclosed please find Notice of Filing Complaint and Order Appointing Receiver along with a check in the amount of $52 to cover the cost to open a Miscellaneous Action in the Southern District of Indiana.

     If you have any questions, please do not hesitate to contact my office. Thank you for your assistance.

              Sincerely,

              *Jeannette Serna*

              Jeannette Serna
              *Paralegal for the Firm*

Enclosure

**EXHIBIT 5**

Doc ID: 003001690025 Type: ORD
Recorded: 09/05/2024 at 09:00:00 AM
Fee Amt: $25.00 Page 1 of 25
Fannin Co. Clerk of Superior Court
DANA CHASTAIN Clerk of Courts

BK **1617** PG **155-179**

05/23/2025 08:57 AM
FAITH KIMBROUGH
MARION COUNTY IN RECORDER
FEE: $ 35.00
PAGES: 25
By: KAMISHA

**CERTIFICATION**
CM/ECF DOCUMENT
I hereby attest and certify that this is a true
and correct printed copy of a document which
was electronically filed with the United States
District Court for the Northern District of
Georgia.

Date Filed: _____08/13/2024_____

By: _____ /Deputy Clerk
Kevin P. Weimer, Clerk of Court

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### (ATLANTA DIVISION)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:24-cv-03583-VMC |
| DRIVE PLANNING, LLC and RUSSELL TODD BURKHALTER, | |
| Defendants, | |
| and | |
| JACQUELINE BURKHALTER, THE BURKHALTER RANCH, DRIVE PROPERTIES, LLC, TBR SUPPLY HOUSE, INC., and DRIVE GULFPORT PROPERTIES, | |
| Relief Defendants. | |

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon Plaintiff Securities and Exchange Commission's unopposed motion to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of Defendant Drive Planning,



LLC ("Receivership Assets") and the assets of Defendant Burkhalter and the Relief Defendants that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; and/or (c) may otherwise be includable as assets of the estates of the Defendants (collectively, the "Recoverable Assets"); and,

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants and Relief Defendants, and venue properly lies in this district.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following Defendant: Drive Planning, LLC (the "Receivership Defendant").

2.      Until further Order of this Court, Kenneth Murena, Esq. is hereby appointed to serve without bond as receiver (the "Receiver") for the estate of the Receivership Defendant.

3.      Except as otherwise specified herein, all Receivership Assets and Recoverable Assets are frozen until further order of this Court.  Accordingly, all persons and entities with direct or indirect control over any Receivership Assets and/or any Recoverable Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing,

selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms and mutual funds.

## II. General Powers and Duties of Receiver

4.     The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Defendant under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

5.     The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Receivership Defendant are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Defendant's operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Receivership Defendant and shall pursue and preserve all of their claims.

6.     No person holding or claiming any position of any sort with any of the Receivership Defendant shall possess any authority to act by or on behalf of any of the Receivership Defendant.

7.     Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

A.     To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendant, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendant owns, possesses, has a beneficial interest in, or controls directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estate");

B.     To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendant; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C.     To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D.     To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.     To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers,

trustees and agents of the Receivership Defendant;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

K. To take such other action as may be approved by this Court.

### III. Access to Information

8. The Receivership Defendant and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, accountants and employees of the Receivership Defendant, as well as those acting in their place, are hereby ordered and directed to preserve and turn over or provide access to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendant and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other

instruments and papers.

  9.  Within ten (10) days of the entry of this Order, the Receivership

Defendant shall file with the Court and serve upon the Receiver and the

Commission a sworn statement, listing: (a) the identity, location and estimated

value of all Receivership Property; (b) all employees (and job titles thereof), other

personnel, attorneys, accountants and any other agents or contractors of the

Receivership Defendant; and, (c) the names, addresses and amounts of claims of

all known creditors of the Receivership Defendant, except to the extent this

information was previously provided to the Commission.

  10.  Within ninety (90) days of the entry of this Order, or at a date set

by the Court, the Receiver shall file with the Court and serve upon the parties a

sworn statement and accounting, with complete documentation, covering the

period from January 1, 2019 to the present:

    A.  Of all Receivership Property, wherever located, held by or in
      the name of the Receivership Defendant, or in which it,
      directly or indirectly, has or had any beneficial interest, or
      over which it maintained or maintains and/or exercised or
      exercises control, including, but not limited to: (a) all
      securities, investments, funds, real estate, automobiles, jewelry
      and other assets, stating the location of each; and (b) any and
      all accounts, including all funds held in such accounts, with
      any bank, brokerage or other financial institution held by,

in the name of, or for the benefit of any of them, directly or indirectly, or over which it maintained or maintains and/or exercised or exercises any direct or indirect control, or in which it had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

B.    Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendant has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendant;

C.    Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by the Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.    Of all assets received by the Receivership Defendant from any person or entity, including the value, location, and disposition of any assets so received;

E.    Of all funds received by the Receivership Defendant, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G.    Of all expenditures exceeding $1,000 made by the Receivership Defendant, including those made on their behalf by any person or entity; and

H.    Of all transfers of assets made by the Receivership Defendant.

11.    Within thirty (30) days of the entry of this Order, the Receivership

Defendant shall provide to the Receiver and the Commission copies of the

Receivership Defendant's federal income tax returns for 2015-2023 with all

relevant and necessary underlying documentation.

12.     The Receivership Defendant and the Receivership Defendant's past

and/or present officers, directors, agents, managers, shareholders, employees,

accountants, debtors, creditors, managers and general and limited partners, and

other appropriate persons or entities shall answer under oath to the Receiver all

questions which the Receiver may put to them and produce all documents as

required by the Receiver regarding the business of the Receivership Defendant, or

any other matter relevant to the operation or administration of the receivership or

the collection of funds due to the Receivership Defendant.  In the event that the

Receiver deems it necessary to require the appearance of the aforementioned

persons or entities, the Receiver shall make its discovery requests in accordance

with the Federal Rules of Civil Procedure.  Nothing in this paragraph, however,

shall preclude a witness, including Defendant Burkhalter, from asserting his or

her Fifth Amendment right against self-incrimination or from claiming any other

legal privilege against providing such information.

13.     The Receiver shall have the authority to issue subpoenas to compel

testimony of persons or production of records, consistent with the Federal Rules

of Civil Procedure and applicable Local Rules, except for the provisions of

Federal Rule of Civil Procedure 26(d)(1), concerning any subject matter within

the powers and duties granted by this Order.

14. The Receivership Defendant is required to assist the Receiver in fulfilling his duties and obligations. As such, it must respond promptly and truthfully to all requests for information and documents from the Receiver. Nothing in this paragraph, however, shall preclude a witness, including Defendant Burkhalter, from asserting his or her Fifth Amendment right against self-incrimination or from claiming any other legal privilege against providing such information.

## IV. Access to Books, Records and Accounts

15. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Defendant. All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

16. The Receivership Defendant, as well as its agents, servants, employees, any persons acting for or on behalf of the Receivership Defendant, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendant are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by,

in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendant that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

A. Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendant except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver, counsel for the Commission, and Defendants a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. Access to Real and Personal Property

18.     The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendant, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and

investments, contracts, mortgages, furniture, office supplies and equipment.

19     The Receiver is authorized to take immediate possession of all real property of the Receivership Defendant, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing or erasing anything on such premises.

20.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Defendant, or any other person acting or purporting to act on its behalf, is ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

21.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendant, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties

to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

## VI. **Notice to Third Parties**

23.     The Receiver shall promptly give notice of his or her appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Defendant, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

25.     In furtherance of his or her responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

26.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business,

operations or activities of the Receivership Defendant (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Defendant. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendant shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Defendant, and/or any mail appearing to contain privileged information belonging to any of the Receivership Defendant's officers, directors, agents, managers, shareholders, employees, managers and general and limited partners, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the Receivership Defendant. The Receivership Defendant shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

27.     Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Receivership Defendant shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

28.     The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of the Receivership Defendant, or its officers, directors, agents, employees or trustees, and to take any and all appropriate steps in connection with such policies.

## VII. <u>Injunction Against Interference with Receiver</u>

29.     The Receivership Defendant and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

> A.     Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

> B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

> C.     Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement

executed by any Receivership Defendant or which
otherwise affects any Receivership Property; or,

D.    Interfere with or harass the Receiver, or interfere in any
manner with the exclusive jurisdiction of this Court over
the Receivership Estates.

30.    The Receivership Defendant shall cooperate with and assist the
Receiver in the performance of his duties.

31.    The Receiver shall promptly notify the Court and SEC counsel of any
failure or apparent failure of any person or entity to comply in any way with the
terms of this Order.

## VIII.  <u>Stay of Litigation</u>

32.    As set forth in detail below, the following proceedings, excluding the
instant proceeding and all police or regulatory actions and actions of the Commission
related to the above-captioned enforcement action, are stayed until further Order of
this Court:

> All civil legal proceedings of any nature, including, but not limited to,
> bankruptcy proceedings, arbitration proceedings, foreclosure actions, default
> proceedings, or other actions of any nature involving: (a) the Receiver, in his
> capacity as Receiver; (b) any Receivership Property, wherever located; (c)
> the Receivership Defendant, including subsidiaries and partnerships; or, (d)
> the Receivership Defendant's past or present officers, directors, managers,
> agents, or general or limited partners sued for, or in connection with, any
> action taken by them while acting in such capacity of any nature, whether as
> plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise
> (such proceedings are hereinafter referred to as "Ancillary Proceedings").

33.    The parties to any and all Ancillary Proceedings are enjoined from
commencing or continuing any such legal proceeding, or from taking any action, in

connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.　　All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.　　Further, as to a cause of action accrued or accruing in favor of the Receivership Defendant against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.　**Managing Assets**

35.　　For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

36.　　The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Drive Planning, LLC," together with the name of the action.

37.　　The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

38.　　Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the

sale or lease, and take all necessary and reasonable actions to cause the sale or lease

of all real property in the Receivership Estate, either at public or private sale, on

terms and in the manner the Receiver deems most beneficial to the Receivership

Estate, and with due regard to the realization of the true and proper value of such real

property.

39.     Upon further Order of this Court, pursuant to such procedures as may

be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and

2004, the Receiver will be authorized to sell, and transfer clear title to, all real

property in the Receivership Estate.

40.     The Receiver is authorized to take all actions to manage, maintain,

and/or wind-down business operations of the Receivership Estate, including

making legally required payments to creditors, employees, and agents of the

Receivership Estates and communicating with vendors, investors, governmental

and regulatory authorities, and others, as appropriate.

41.     The Receiver shall take all necessary steps to enable the Receivership

Funds to obtain and maintain the status of a taxable "Settlement Fund," within the

meaning of Section 468B of the Internal Revenue Code and of the regulations, when

applicable, whether proposed, temporary or final, or pronouncements thereunder,

including the filing of the elections and statements contemplated by those provisions.

The Receiver shall be designated the administrator of the Settlement Fund, pursuant

to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements

imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a

taxpayer identification number, (b) timely filing applicable federal, state, and local

tax returns and paying taxes reported thereon, and (c) satisfying any information,

reporting or withholding requirements imposed on distributions from the Settlement

Fund.  The Receiver shall cause the Settlement Fund to pay taxes in a manner

consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."

The Receivership Defendant shall cooperate with the Receiver in fulfilling the

Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## X.  Investigate and Prosecute Claims

42.     Subject to the requirement, in Section VII above, that leave of this

Court is required to resume or commence certain litigation, the Receiver is

authorized, empowered and directed to investigate, prosecute, defend, intervene in or

otherwise participate in, compromise, and/or adjust actions in any state, federal or

foreign court or proceeding of any kind as may in his discretion, and in consultation

with SEC counsel, be advisable or proper to recover and/or conserve Receivership

Property.

43.     Subject to his or her obligation to expend receivership funds in a

reasonable and cost-effective manner, the Receiver is authorized, empowered and

directed to investigate the manner in which the financial and business affairs of

the Receivership Defendant were conducted and (after obtaining leave of this

Court) to institute such actions and legal proceedings, for the benefit and on behalf

of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver may file a motion with the Court to waive all privileges, including the attorney-client privilege, held by the Receivership Defendant. The Receiver must confer with counsel for Defendant Burkhalter before filing any such motion and explain the reason(s) for seeking the waiver. If the Receiver and Defendant Burkhalter are unable to reach an agreement, the Receiver may file his or her motion and Defendant Burkhalter shall have the opportunity to respond to any such motion.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his or her Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI. **Bankruptcy Filing**

46.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendant. If a Receivership Defendant is placed in bankruptcy

proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity, except that the Receiver shall not be empowered to waive all privileges, including the attorney client privilege, unless granted permission to do so by the Court.  Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendant and may therefore file and manage a Chapter 11 petition.

47.     The provisions of Section VIII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendant in bankruptcy proceedings.

## XII.  Liability of Receiver

48.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

49.     The Receiver and his/her agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel nor shall the Receiver

or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

50.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

51.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIII.  Recommendations and Reports

52.     The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

53.     Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

54.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file with the Court and serve on the parties a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the

existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

55.    The Quarterly Status Report shall contain the following:

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

56.    On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIV.  Fees, Expenses and Accountings

57.    Subject to Paragraphs 58– 64 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

58.    Subject to Paragraph 59 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

59.    The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

60.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

61.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

62.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

63.     Each Quarterly Fee Application shall:

A.     Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B.     Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of

the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

64.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED, this** _13th_ **day of** _August_____, **2024, at Atlanta,** **Georgia.**

**VICTORIA MARIE CALVERT**
**UNITED STATES DISTRICT JUDGE**



DAMIAN | VALORI | CULMO

May 21, 2025

V<small>IA</small> F<small>ED</small>E<small>X</small>

Attn: Recording Clerk
Marion County Recorder's Office
200 E Washington Street, Suite 721
Indianapolis, IN 46204

    Re: *United States Securities and Exchange Commission v. Drive Planning, LLC, et al.*
        Case No. 1:24-mc-00046-JRS-MKK

Dear Clerk:

    I enclose a check in the amount of $35.00 to cover the cost of recording the enclosed original Certified copy of the *Order Appointing Receiver* [ECF 10] entered on August 13, 2024 in the United States District Court Northern District of Georgia (Case No. 1:24-cv-03583-VMC) which was filed in the Miscellaneous Action Case No. 1:24-mc-00046-JRS-MKK in the Southern District of Indiana.

    I have also enclosed a return FedEx envelope for your convenience.

    If you have any questions, please do not hesitate to contact my office. Thank you for your assistance.

    Sincerely,

    *Jeannette Serna*

    Jeannette Serna
    *Paralegal for the Firm*

Enclosure